**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH AIELLO, MATTHEW DRAPKIN, ESTATE OF DONALD DRAPKIN, MICHAEL J. PALMER, MICHAEL J. PALMER AND VIRGINIA A. PALMER LIVING TRUST, ADAM BERK, ROBERT SCHECTERSON, AMY GRABINO, ANTHONY CAVALIERI, MELVIN GOLDBERG, LAWRENCE KAYE, ANN KAYE, LAWRENCE G. KAYE AND H. ANNE KAYE 1996 REVOCABLE LIVING TRUST, TERRY WEBER, JOHN HELM, BRIAN KAFFEE, STUART KAFFEE, KAFFEE CO. LLC, JASON PALMER, PAUL SWISTAK, JAMES TISONY, and DAVID SNIDER,

Plaintiffs,

v.

HOWARD BROWN, MICHAEL BROWN, HITOUCH NASHVILLE LLC, ARROWMARK COLORADO HOLDINGS, LLC, DAVID CORKINS, STEVEN M. GOLDMAN, JOHN EISINGER, MICHAEL NOVOSELLER, SANJAI BHONSLE, KAREN REIDY, DANA STAGGS, JOHN FRISK, STEVEN CHAMBERS, ANDREW KOHN, MICHAEL CORNELL, LES GOODMAN, ANDREW KOVACH, JAY NADEL, and RANDI SIDGMORE,

Defendants,

BROWN (RI) INVESTMENT COMPANY, LLC,

A Required Party.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, Joseph Aiello, Matthew Drapkin, the Estate of Donald Drapkin, Michael J. Palmer, the Michael J. Palmer and Virginia A. Palmer Living Trust, Adam Berk, Robert Schecterson, Amy Grabino, Anthony Cavalieri, Melvin Goldberg, Lawrence Kaye, Ann Kaye, Lawrence G. Kaye and H. Anne Kaye 1996 Revocable Living Trust, Terry Weber, John Helm,

Brian Kaffee, Stuart Kaffee, Kaffe Co. LLC, Jason Palmer, Paul Swistak, James Tisony and David Snider (together, "Plaintiffs") holders of common units of Brown (RI) Investment Company LLC ("Brown Investment Company" or "BIC"), by and through their undersigned counsel, bring this Complaint against HiTouch Nashville, LLC; ArrowMark Colorado Holdings, LLC; a "control person" of both those entities; and certain of BIC's current and former managers and affiliates. Plaintiffs hereby demand a trial by jury.

## INTRODUCTION

1. Since 2007, BIC functioned as a holding company for a portfolio of businesses within the office services and supply industry, including Rentacrate, Inc. ("Rentacrate"), HiTouch Business Services, LLC ("HiTouch"), MyOfficeProducts, LLC ("MyOp LLC"), and MyOffice Products Holdings, Inc. ("MyOP Holdings").

2. After years of financial struggle, BIC was able to reach an agreement in principle to sell its operating subsidiaries to Staples Inc. ("Staples") in August 2016. However, BIC's Chairman Howard Brown refused to allow that transaction to go forward unless he and his son Michael Brown received millions of dollars in excessive and unwarranted payments for non-compete agreements. Staples refused, and the deal fell apart in November 2016.

3. BIC was able to revive the deal and reached another agreement in principle with Staples in April 2017. However, BIC's insiders again prevented this deal from going forward. Rather, in order to squeeze more value for themselves from the sale of the financially troubled BIC, the BIC Insiders (as defined in Paragraph 45) engaged in a "restructuring". Through a series of complex transactions, including two issuances of securities, the BIC Insiders not only dramatically diluted the holders of BIC's common units (the "Common Members"), including the

Plaintiffs, but also made the Common Members liable for more than $30 million in taxable income when the Staples acquisition ultimately went forward in June 2018.

4. As a result, the Common Members, including the Plaintiffs, lost almost their entire investments. At the same time, while receiving almost none of the cash proceeds from the acquisition they were charged with almost all of the negative tax consequences flowing from it.

5. By structuring transactions for the purpose of depriving the Common Members of the benefit of their investments and by omitting material facts from offering materials for securities offerings, certain Defendants committed securities fraud in violation of Rule 10b5(b), 10b5(a,c), and common law fraud under Delaware law, certain Defendants violated their duties of good faith and fair dealing under Delaware law. One Defendant is liable under Section 20(a) of the 1934 Securities Exchange Act. Certain Defendants also violated fiduciary duties to the Common Members and certain Defendants acted negligently with regards to the Plaintiffs' investments.

## Jurisdiction and Venue

6. This Court's jurisdiction is based upon 28 U.S.C. §§ 1331 and 1332; Section 27 of the 1934 Securities Exchange Act, 15 U.S.C. §77aa.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c); 29 U.S.C § 1132e(2); and Section 17 of the 1934 Act.

8. Paragraph 13.5 of BIC's Fifth Amended and Restated Operating Agreement (the "Fifth BIC A&R") (attached hereto as Exhibit 1) provides that this litigation may only be brought in the state and federal courts located in the Southern District of New York.

## The Parties

**Plaintiffs**

9. Plaintiff Joseph Aiello is or was a holder of 2,824 BIC common units.[1] He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

10. Plaintiff Matthew Drapkin is or was a holder of 795 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

11. Plaintiff Estate of Donald Drapkin is or was a holder of 3,438 BIC common units. Donald Drapkin continuously held units in BIC since 2007 those units are now the property of the estate. Neither Donald Drapkin nor his estate exercised preemptive rights in connection with the April 2018 securities offering.

12. Plaintiff Michael Palmer, through Plaintiff Michael J. Palmer and Virginia A. Palmer Living Trust, is or was a holder of approximately 2,245 BIC common units. The Michael J. Palmer and Virginia A. Palmer Living Trust was a unitholder of BIC at the time of the wrongdoings complained of. The trust did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

---

[1] In 2017 or 2018, BIC recalculated the numbers of common units resulting in a diminishment in the gross numbers of common units held by the Plaintiffs. *See* Capital Table, attached as Schedule A to Exhibit 1 attached hereto. Because it appears that BIC included previously purchased preferred units for at least some Plaintiffs in performing the calculations that resulted in Schedule A, Plaintiffs here have identified their common units held pre-recalculation. In any event, each of the Plaintiffs is and was a holder of common units at all relevant times.

13. Plaintiff Adam Berk is or was a holder of 394.50 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

14. Plaintiffs Robert Schecterson and Amy Grabino together own or owned 327 BIC common units. They were unitholders of BIC at the time of the wrongdoings complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

15. Plaintiff Anthony Cavalieri is or was a current holder of approximately 1,274 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

16. Plaintiff Melvin Goldberg is or was a holder of 763 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

17. Plaintiffs Lawrence Kaye and Ann Kaye, through Plaintiff Lawrence G. Kaye and H. Anne Kaye 1996 Revocable Living Trust, own or owned approximately 519 BIC common units. They were unitholders at the times of the wrongs complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

18. Plaintiff Terry Weber is or was a holder of 311.50 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

19. Plaintiff John Helm is or was a holder of 186 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

20. Plaintiffs Brian Kaffee and Stuart Kaffee together, through Plaintiff Kaffee Co. LLC, own or owned 265 BIC common units and were unitholders at the times of the wrongs complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

21. Plaintiff Jason Palmer is or was a holder of 232 BIC common units. He and was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

22. Plaintiff Paul Swistak is or was a holder of 29 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

23. Plaintiff James Tisony is or was a holder of approximately 138 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

24. Plaintiff David Snider is or was a holder of approximately 250 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

**<u>Defendants</u>**

25. Howard Brown is a founder, and at all relevant times, a Manager of BIC and serves or served as BIC's Chairman.

26. Michael Brown is Howard Brown's son. He is, and was at all relevant times, a Manager of BIC.

27. ArrowMark Colorado Holdings LLC (a/k/a Arrowpoint Asset Management LLC and operating under the trade name ArrowMark Partners) ("ArrowMark") is a limited liability

company formed under the laws of Delaware with its principal place of business at 100 Fillmore Street, Suite 325, Denver, Colorado 80206. ArrowMark was formerly known as Arrowpoint Agency Services, LLC, and entered into, under that name, the October 29, 2015 credit agreement with BIC and BIC's subsidiaries and affiliates, among other agreements. No later than the January 31, 2018, it had changed its name to ArrowMark. For the purposes of clarity this entity is referred to throughout as "ArrowMark".

28. HiTouch Nashville LLC ("HiTouch Nashville") is a limited liability company formed on January 30, 2018 under Delaware state law, with its headquarters in Nashville, Tennessee.

29. ArrowMark and HiTouch Nashville have collectively been the Tax Representative for BIC from at least January 31, 2018 to the present.

30. David Corkins served as ArrowMark's Managing Member at all relevant times, with the power to direct the activities of ArrowMark. Upon information and belief, David Corkins served as HiTouch Nashville's Managing Member at all relevant times, with the power to direct the activities of HiTouch Nashville; the basis of this belief is the signature of Mr. Corkins as the official representative of that entity on one of the BIC operating agreements identified below.

31. Steven M. Goldman is a lawyer and a partner at Kramer, Levin, Naftalis and Frankel, LLP ("Kramer Levin"), a law firm and BIC's longtime outside legal counsel. He was a Manager of BIC from 2015 to 2017 and was a Manager of MyOP Holdings, a BIC subsidiary.

32. John Eisinger is or was a managing director of ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least May 2018.

33. Michael Novoseller is or was a managing director of ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least January 2018 to April 2018.

34. Sanjai Bhonsle is a partner and portfolio manager for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least January 2018.

35. Karen Reidy is a partner and portfolio manager for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least January 2018.

36. Dana Staggs is an investment analyst for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least May 2018.

37. John Frisk was and, upon information and belief, remains the President of BIC's operating entities both before and after BIC's acquisition by Staples. He was a Manager of BIC from at least January 2018 to June 2018, and regularly participated in BIC's management before then. He was also the primary contact for the Staples mergers and acquisitions team from at least 2016 to 2018.

38. Steven Chambers is the former acting Chief Financial Officer of BIC from at least 2017 and an ArrowMark affiliate.

39. Andrew Kohn was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

40. Michael Cornell was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

41. Les Goodman was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

42. Andrew Kovach was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

43. Jay Nadel was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

44. Randi Sidgmore was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

45. HiTouch Nashville, ArrowMark, Howard Brown, Michael Brown, Steven Goldman, and John Frisk (the "BIC Insiders") directly or through their employees or agents controlled the operations of BIC at all relevant times.

46. Howard Brown, Michael Brown, Brown Management, John Frisk, Michael Novoseller, John Eisinger, Sanjai Bhonsle, Karen Reidy and Dana Staggs served as elected Managers of BIC for some or all of the period from January 2018 to at least June 2018, with all the rights and responsibilities associated therewith (the "2018 Managers").

47. Howard Brown, Michael Brown, Brown Management, Steven Goldman, Andrew Kohn, Michael Cornell, Les Goodman, Andrew Kovach, Jay Nadel, and Randi Sidgmore served as elected Managers of BIC and MyOP, Holdings for some or all of the period from 2015 to 2017, with all the rights and responsibilities associated therewith (the "2015-2017 Managers").

48. BIC is identified herein as a necessary party, insofar as it is subject to service of process and because: in the absence of that party the Court may not be able to accord complete relief; BIC has an interest in the subject matter of this litigation; and omitting BIC from this litigation could both affect its ability to protect its interest in this litigation and expose it to a substantial risk of inconsistent obligations following the results of this litigation.

## FACTS

49. As described in more detail below, the causes of action in this case arise from transactions in at least four closely-related entities: Brown Investment Company, the entity through which the Common Members, including Plaintiffs, made their investments and the ultimate parent for the other entities; HiTouch, an operating company; MyOfficeProducts, Inc.

("MyOP Inc."), which was reformed into MyOP LLC, an operating company and also a Delaware LLC; MyOP Holdings, a Delaware corporation that has made a subchapter S election. In addition to the above, two other entities, Brown (RI) Investment Management and BRI Joint Lending Corp., were created for the purposes of creating a corporate manager for BIC and for making loans to BIC respectively. The relationships between these various entities being important to the allegations in the Complaint, those relationships are described in more detail below.

50. BIC was formed in 2007 for the purpose of investing in operating subsidiary companies within the office services and supply industry.

51. BIC owns 100% of HiTouch.

52. In November of 2010, HiTouch acquired MyOP Inc.

53. Pursuant to the Amended and Restated Operating Agreement dated June 1, 2007 ("First BIC A&R"), BIC offered only one class of membership interest to its members. Section 4.2 of the First BIC A&R also granted its members preemptive rights – the right to first subscribe for his or her *pro rata* share of any new equity issuance on the same terms and conditions proposed to be offered. This provision remained constant throughout the various iterations of the operating agreements to come.

54. As of January 1, 2012, MyOP Inc. was converted to an LLC for tax purposes – MyOp LLC.

55. The newly created MyOp LLC then distributed 100% of its preferred units and 5% of its common units to the newly created formed holding company, MyOp Holdings.

56. On or about February 17, 2012, BIC initiated a junior secured subordinated note offering to raise working capital for HiTouch and MyOp LLC. In an e-mail to BIC Common Members Kramer Levin represented that if BIC did not raise at least $3 million in notes, it would

likely cancel the offering and, instead, make a capital call from the members who held capital call units. Upon information and belief, BIC ultimately raised more than $3 million in notes.

57. The promissory notes issued in connection with the offering were due to mature on July 31, 2015.

### A. ArrowMark Gradually Takes Control Of BIC

58. After years of generally productive business, BIC began to experience cash flow issues in 2014 and 2015 that threatened its ability to repay the 2012 promissory notes. To alleviate the strain, BIC (through its subsidiaries) entered two credit facilities in late 2015: one with JP Morgan Chase Bank N.A. ("JPM") and the other with ArrowMark.

59. On October 29, 2015, HiTouch, MyOp LLC, and Rentacrate entered an asset-backed credit agreement with JPM (the "ABL Agreement"). The ABL Agreement allowed the companies to borrow up to $35 million, limited to a percentage of their respective accounts receivable and certain inventory. BIC and MyOP, Holdings, guaranteed the debt of their respective subsidiaries under the ABL Agreement.

60. On October 29, 2015, BIC also entered a term loan credit facility with ArrowMark in the total amount of up to $27.5 million plus up to an additional $10 million (the "Term Loan Agreement").

61. Simultaneously upon executing the Term Loan Agreement, the BIC Board issued to ArrowMark and certain of its co-investors preferred units – a new class of ownership interest in BIC (the "Preferred Unit Offering") on very favorable terms. The Board also issued to ArrowMark common units representing approximately 4% of the issued outstanding common units for no additional consideration (the "Equity Kicker").

62. In October 2015, BIC sent the Common Members a Notice of Preemptive Rights. Therein, Common Members were notified of the Preferred Unit Offering and their right to subscribe for their *pro rata* share of the preferred units, but they were also encouraged to waive their preemptive rights – i.e. **not** to participate in the Preferred Unit Offering. Specifically, the Board informed its members that ArrowMark would **not** participate in the offering if it did not receive **at least $5 million** in preferred units, and, if that happened, the Term Loan would also fall apart. Ultimately, ArrowMark purchased approximately $7.5 million in preferred units.

63. The Third BIC Amended and Restated Operating Agreement ("Third BIC A&R") also provided ArrowMark with a seat on the BIC Board of Managers. According to Section 2.15, the Board was prohibited from taking certain actions without the approval of the ArrowMark board member ("ArrowMark Representative"), including filing for bankruptcy; entering material acquisitions or dispositions of stock or assets; issuing junior, senior, or *pari* equity; or causing a change of control that would **not** result in the Preferred Members receiving the maximum amount of distributions on their investments.

### B. BIC Defaults Under the ABL Agreement, Significantly Worsening its Financial Position

64. Less than three months after entering the ABL Agreement with JPM, BIC defaulted. On January 21, 2016 JPM sent BIC (through its subsidiary HiTouch) a letter outlining the events of default, which included: (1) making representations that materially failed to present fairly the financial position of the company in accordance with GAAP; (2) failing to timely furnish to JPM its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows; and (3) failing to keep proper books and records. BIC did not disclose to its Common Members that JPM considered it to be in default under the ABL Agreement. JPM, however, agreed to waive the claimed events of default upon certain conditions.

65. Faced with additional liquidity issues, on January 20, 2016, HiTouch and MyOp LLC entered into an agreement with Essendant, Inc., ("Essendant") a wholesaler of office supplies and one of BIC's principal vendors, under which Essendant agreed to pay a one-time fee in the amount of $12.5 million in exchange for HiTouch and MyOp LLC's commitment to make $105 million in total purchases in the first year of the agreement, and $125 million per year thereafter.

66. Meanwhile, with ArrowMark now acting as a BIC lender, preferred equity holder, and manager, the BIC Board began to look for a strategic buyer and to that end, by April 2016, the Board had entered acquisition negotiations with Staples.

## C. BIC Again Defaults on Its Loan Agreement with JPM

67. BIC and Staples negotiated over the potential sale of BIC subsidiaries HiTouch and MyOP LLC between April and August 2016. By August 30, 2016, BIC and Staples had negotiated and fully-executed a Letter of Intent (the "First LOI"). Upon information and belief, the acquisition was scheduled to close within 60 to 90 days thereafter.

68. The First LOI provided that Staples would acquire HiTouch and MyOp LLC for a total of $110 million in cash.

69. By November 2016, with the closing imminent, BIC's subsidiaries undertook significant transition of services and planning with Staples.

70. JPM issued another notice of default under the ABL Agreement to BIC, HiTouch, MyOp LLC, and MyOp Inc. in November 2016. As of the date of default, the amounts outstanding under the ABL Agreement totaled approximately $26.7 million. However, JPM executed a second forbearance agreement on November 15, 2016, conditioned on the agreement (contained in a side letter agreement of the same date) by BIC and MyOp Inc. to sell all their equity interests in HiTouch and MyOp LLC to Staples by November 30, 2016, as contemplated in the First LOI with

the transaction to close not later than January 31, 2017. The entities promised to satisfy all of their obligations under the ABL Agreement in full, from the sales proceeds.

**D. Howard Brown Blows Up the First Staples Acquisition**

71. The acquisition fell apart because, as explained below, Staples would not accede to Howard Brown's eleventh-hour demands that Staples make certain multi-million-dollar direct payments to both himself and Michael Brown as part of the consideration for the acquisition.

72. As noted above, on August 30, 2016 Staples had extended a "best and final" offer for the acquisition of HiTouch and MyOP Inc. for a proposed purchase price of $110 million. This "best and final" offer included as a condition that certain "key employees" continue to work for those entities after the acquisition.

73. During the course of the negotiations following the execution of the First LOI, it developed that Staples was not interested in keeping Michael Brown employed after the acquisition but was interested primarily in retaining John Frisk and Butch Johnson from the ranks of BIC's executives. Howard Brown was going to remain temporarily as a consultant.

74. Realizing that Staples would not continue to pay his son's six-figure salaries post-acquisition or his for very long, Howard Brown sought to re-negotiate the deal to obtain millions of dollars in value for himself and his son by way of direct payments to them linked to non-compete agreements. Staples refused to change the terms of its offer to accommodate multi-million payments for non-compete agreements.

75. Howard Brown's eleventh-hour attempt to renegotiate material terms in the First LOI caused the deal to fail. As Michael Brown wrote to Joseph Aiello in November 2016, Howard Brown "just needs to shut his mouth and the deal will get done".

76. As a result of Howard Brown's continued attempts to seek these payments, the Staples M&A team became wary of moving forward under the original terms and on or about November 22, 2016, Staples slashed its proposed purchase price by $40 million, reducing the offer for HiTouch and MyOP LLC to approximately $70 million.

77. In a desperate attempt to salvage the deal, on or about November 27, 2016, Michael Brown reached out to Staples and offered to reduce the original purchase from $110 million to $100 million.

78. Staples rejected Michael Brown's proposal and terminated negotiations.

**E. <u>BIC's Financial Situations Grows Even More Perilous</u>**

79. With the Staples acquisition off the table, at least for the moment, BIC scrambled to secure additional capital to meet its existing obligations and fund day-to-day operations.

80. On December 1, 2016, BIC attempted secure an additional $10 million set-aside from Essendant which it would use to pay MyOp LLC's obligations under the existing supply agreement, which were quickly coming due in January. That failed. On December 5, 2016, Essendant informed Howard Brown that it would not extend further credit to MyOp LLC.

81. Hours later, Howard Brown circulated a letter to investors. Despite the bleak financial outlook for BIC and its subsidiaries following the failed Staples acquisition, he painted a misleadingly positive picture of the state of the companies.

82. First, Howard Brown informed investors that Staples, BIC, and MyOp Inc. had "mutually decided" to terminate negotiations. He offered no reason for the termination to BIC's Common Members, choosing to omit the fact that his eleventh-hour attempt to secure a better deal for himself and his family caused Staples to reduce its originally proposed purchase price by almost 40%.

83. The December 5, 2016 letter also omitted the material fact that by failing to finalize a deal for the Staples acquisition by November 30, 2016, BIC was in default of the November 15, 2016 Forbearance Agreement with JPM, although the letter did note that HiTouch was "out of compliance with some of the requirements contained in our borrowing facilities and was working with . . . lenders to determine a new course and action plan."

84. To try to raise working capital for the failing subsidiaries, Howard Brown used the December 5, 2016 letter to gauge investors' interest in a $5 to $10 million preferred equity offering. He noted that an internal raise would be "far less punitive" to the Common Members in terms of dilution than an injection of outside capital.

85. In a January 9, 2017 letter, Howard Brown informed investors that the preferred equity offering would not be going forward but that there would instead be a Convertible Note Offering. Like the December 5, 2016 letter, the letter to investors also omitted or misstated key facts.

86. Among other things, Howard Brown noted that BIC and its subsidiaries had entered into another agreement with JPM(the "Amended and Restated Forbearance Agreement"), although he neither identified that agreement as a forbearance agreement nor stated that, as previously noted, BIC's failure to close the Staples acquisition by November 30, 2016 constituted a default under the November 15, 2016 Forbearance Agreement with JPM.

87. Howard Brown also stated that the Carl Marks Advisory Group ("Carl Marks") was hired at BIC's "senior lender's request" to "review and advise" the company on its financial position, understating the true facts: that JPM had **required** that BIC retain Carl Marks to regularly review its financials (and give JPM unfettered access thereto) and deliver an Assessment Report to JPM **as a condition** of the Amended and Restated Forbearance Agreement.

88. Further, Howard Brown framed the Convertible Note Offering as a way to simply "bridge the timing gap" until BIC and its lenders could come up with a long-term solution to its liquidity issues. However, given existing market conditions and BIC's credit constraints, that the only "long term solution" would be an acquisition as the BIC Insiders knew or should have known.

**F. <u>BIC and ArrowMark Restructure the February Loans to Satisfy its Existing Creditors While Reopening Acquisition Discussions with Staples</u>**

89. No later than March 2017, BIC and Staples reopened acquisition negotiations. Until a deal could be reached, however, BIC and its subsidiaries had to cure its existing defaults with several creditors.

90. Accordingly, in March 2017, BIC and ArrowMark modified the Term Loan Agreement, apparently for the **fourth** time. Pursuant to the modified terms, ArrowMark increased its total Term Loan to $30.9 million (plus capitalized interest). BIC took out two other loans, one of which was also from ArrowMark. JPM also agreed to execute a Second Amended and Restated Forbearance agreement dated March 31, 2017, extending the existing forbearance date to December 29, 2017. As of March 31, 2017, the total amount still owing under ABL Credit Agreement was approximately $20 million.

91. Through these measures BIC Insiders were able to buy additional time to finalize an acquisition deal with Staples.

92. On April 14, 2017, Staples and BIC executed a second letter of intent on (the "Second Letter of Intent"). Staples decreased the proposed purchase price of HiTouch and MyOp LLC by more than $30 million - from $110 million to $76.5 million, subject to a further 10% holdback to secure BIC's post-closing obligations.

93. The Second Letter of Intent contained an explicit provision providing that Staples would pay $3 million to each of Michael Brown and Howard Brown as "additional consideration" for their agreement to enter noncompete agreements.

94. Such "additional consideration" had not been included in the First LOI.

95. In a November 15, 2017 letter to investors, BIC revealed that, for a second time, negotiations with Staples had come to an end. Citing the best interests of its equity holders, BIC rejected the deal purportedly because investors would have received a *de minimis* return on their capital contributions. Specifically, Howard Brown estimated that equity investors would have received 12 cents per dollar invested - an aggregate diminution in value of 88%.

96. However, that deal would have resulted in materially better outcomes for the Common Members than the deal that ultimately closed in June 2018. Under the April 2017 deal, all of the debt would have been paid, no extraordinary tax consequences incurred, and the Common Members, including the Plaintiffs, would have receive a return of a non-trivial part of their initial investment.

**G. <u>BIC Insiders Turn to Fraud to Improve Their Outcomes From the Staples Acquisition</u>**

97. Running out of alternatives to secure substantial benefits for themselves through a transaction with a counterparty, the BIC Insiders hatched a plan to wrest those benefits from the Common Members, including the Plaintiffs. Knowing that the Staples acquisition was the only viable exit strategy for the company, and that they could not materially improve the terms upon which Staples would be willing to buy BIC's operating subsidiaries, the BIC Insiders devised a plan to generate additional benefits for BIC Insider ArrowMark while at the same time diverting substantially all of the net proceeds from the acquisition to themselves.

98. Between December 2017 and June 2018, the BIC Insiders carried out a series of transactions (the "Restructuring") that permitted BIC Insiders to redistribute the income flows from the Staples acquisition so as to avoid the payment of any but a *de minimis* amount to the Common Members. The Restructuring also generated substantial taxable gains that would be passed along to the Common Members which created equally substantial tax-deductible losses benefitting the BIC Insider ArrowMark.

99. It is worth noting that around this time, the BIC Insiders, or at least some of them, were suffering personal financial woes that may have motivated their misconduct. On March 5, 2018, Michael Brown filed for personal bankruptcy protection.

100. The BIC Insiders carried out this scheme in six steps.

101. First, they amended the operating agreement to eliminate any check on their ability to structure transactions in their own favor.

102. Second, they brought in tax accountants, KPMG, willing to endorse the positions necessary to make the tax aspects of the scheme work and identified BIC Insiders ArrowMark and HiTouch Nashville as BIC's Tax Representatives, with the sole authority to make decisions about tax at BIC.

103. Third, with the help of KPMG they revised the tax accounting of a 2012 transaction to transfer capital gains (and associated tax liabilities) to the Common Members.

104. Fourth, again with the assistance of KPMG, BIC Insiders concocted phony cancellation of debt transactions that generated tax-deductible losses for BIC Insider ArrowMark, while at the same time not materially affecting ArrowMark's ability to profit from the Staples acquisition.

105. Fifth, they issued securities to ArrowMark, while at the same time omitting material information (about the Staples acquisition that would close in June 2018, which was known to the BIC Insiders but not the Common Members) and otherwise discouraging the Common Members from exercising their preemptive rights to the same class of securities to, in significant part, make up for the "losses" that ArrowMark sustained as a result of the phony cancellation of debt transactions.

106. Sixth, and finally, they used fictitious non-compete payments and other strategies to divert proceeds from the Staples acquisition to themselves, including ArrowMark, again with the purpose of, in part, making up to ArrowMark its "losses" from cancelling debt.

**H. BIC Insiders Amend the Operating Agreement to Shut Out the Common Members**

107. The BIC Board of Managers, including the ArrowMark Preferred Member, amended the Third BIC A&R as of December 25, 2017 ("Amendment 1") (attached hereto as Exhibit 2).

108. Amendment 1 granted the BIC Board of Managers the authority to enter certain "Exempt Affiliated Transactions" without the approval of any member. Pertinently, the "entry into and performance of obligations under the Term Loan Agreement and any other documents or agreements entered into in connection therewith, "**including any modification and recapitalization of any obligations thereunder (including any conversion of any obligations thereunder to Equity Securities)**" constituted an Exempt Affiliated Transaction. As a result of this change, the Common Members were stripped of ability to protect themselves from self-dealing by the BIC Insiders.

109. Amendment 1 also altered the notification period with respect to the Common Members' preemptive rights, permitting the BIC Board of Managers to delay notifying Common Members of an equity issuance for up to 90 days.

110. As a result, Amendment 1 allowed the BIC Board of Managers to effectuate the Restructuring without the knowledge or approval the Common Members.

**I. ArrowMark Takes Power As Tax Representative and Replaces BIC's Outside Accountants**

111. ArrowMark and HiTouch Nashville acted on their powers as BIC's Tax Representatives, an office they had assumed with the adoption of the Fourth Amended and Restated BIC Operating Agreement in January 2018 and which continued in the Fifth Amended and Restated Operating Agreement ("Fifth BIC A&R") (Exhibit 1) of April 2018.

112. No later than 2017 ArrowMark and HiTouch Nashville caused BIC to hire KPMG as outside accountants.

113. Sometime in 2018, likely in January, KPMG displaced Anchin Block & Anchin, LLP, BIC's previous outside accountants. KPMG then made significant changes to BIC's historic accounting and tax reporting practice for the 2017 tax year.

114. First, it adjusted the Common Members' capital accounts for a 2012 stock distribution never booked by BIC's prior accounting firm.

115. Second, KPMG also moved approximately $28 million in debt from the MyOp Inc. level to BIC.

116. Third, KPMG changed BIC's tax reporting from GAAP basis to Section 704(b) basis.

### J. The BIC Insiders Restructure BIC, Attributing Phony Cancellation of Debt Income to the Common Members

117. Having "locked out" the Common Members and acquired new accountants for BIC, the BIC Insiders proceeded with the scheme to defraud the Common Members and squeeze all the possible value (for themselves) from the Staples acquisition.

118. First, BIC cancelled all issued and outstanding preferred units and common units sold to ArrowMark pursuant to the Preferred Equity Issuance.

119. Second, ArrowMark's $22,500,000 Term Loan (plus interest) was converted into a new tranche of term loan in the aggregate amount of $7,869,727.27 at a 5.85% interest rate. The parties also deemed satisfied all of the accrued and unpaid interest thereon. This resulted in a cancellation of debt of approximately $14 million. While, in the ordinary course, a cancellation of debt transaction between counterparties transacting at arm's length redounds primarily to the benefit of the former debtor, that was not the case in this sham transaction. This cancellation of debt did not materially affect ArrowMark's ability to obtain proceeds from the Staples acquisition, as described below, and instead resulted only in benefits to it, in the form of ordinary losses that it could use to avoid millions of dollars in income tax. Of course, these benefits had to be balanced, from a tax perspective, by corresponding taxable gains, which were distributed to the Common Members, including the Plaintiffs, resulting in millions of dollars in tax liabilities for them.

120. Third, a $4.3 million bridge loan from ArrrowMark (the "AM Bridge") (which, by January 31, 2018 totaled approximately $4.6 million, including interest), was converted to a standalone term loan with an interest rate of 5.85%. Accordingly, following the Restructuring, the outstanding balance of loans made by ArrowMark totaled approximately $12.5 million.

121. Fourth, a second $4.3 million loan (the "HT Bridge Loan") was converted into Class B preferred units.

122. Fifth, ArrowMark released Howard Brown from his personal guarantee of BIC's obligations under the Term Loan Agreement.

123. Sixth, BIC converted each common unit issued to ArrowMark pursuant to the Equity Kicker to .04 Common Units.

124. Finally, BIC sold a total of 54,720.6 Class A Preferred Units to ArrowMark, Hownan Investment Co., and certain other members of BIC for the aggregate purchase price of $9 million ($164.47 per Unit).

125. Other defendants also participated in what turned out to be a very profitable short-term investment in these Class Preferred Units.

126. Steven M. Goldman, a lawyer at Kramer Levin, counsel for BIC, bought $650,000 worth of Class A Preferred Units.

127. Randi Sidgmore purchased $250,000 worth of Class A Preferred Units.

128. John Frisk bought $100,000 worth of Class A Preferred Units, as did Ilan Kaufthal of Eastwind Advisors.

129. Andrew Kohn bought $50,000 worth of Class A Preferred Units.

### K. BIC Insider Howard Brown Omits the Material Facts of the Imminent Staples Acquisition From the Offering Materials Sent to the Common Members and Discourages them from Exercising Their Preemptive Rights

130. Approximately 90 days later, on April 23, 2018, BIC circulated a Preemptive Offer Letter (attached as Exhibit 3) and a Private Placement Memorandum to its Common Members

(attached as Exhibit 4) in connection with the Restructuring (the "April 2018 Preferred Equity Offering").

131. Howard Brown simply omitted to inform the Common Members of the imminence of the Staples acquisition that would close two months after this equity offering, a fact that would have been material to any Common Member considering exercising their preemptive rights. Moreover, the private placement memorandum contained language that was materially misleading in light of this omission, specifically under the heading "Potential Transactions":

> From time to time, the Company [BIC] receives inquiries from third parties regarding potential transactions, including, for example, acquisitions of or business combinations with the Company and/or its subsidiaries. The Company considers such inquiries as they are proposed in order to determine whether any such potential transaction would be in the best interests of the Company and its members. Such consideration may sometimes include meetings and/or other discussions with management of third parties. There can be no assurance that any such inquiries or discussions will result in any potential transactions actually occurring.

132. Based on these representations, a reasonable investor would have expected an imminent transaction with Staples to have been disclosed. But it was not.

133. Upon information and belief, Howard Brown and the BIC Insiders knew that the Staples Transaction would go forward on the terms it ultimately did go forward on during the entire period between November 2017 and June 2018.

134. The source of this information and belief is as follows:

135. First, the simple fact the Staples acquisition went forward in June 2018 on substantially the same terms that were offered in November 2017, albeit at a $78.5 million purchase price instead of $76.5 million, is a strong indicator that a deal along such terms was available in this period.

136. Second, had there been any real doubt about the fact that Staples would ultimately go forward, a sophisticated investor like ArrowMark would not have put at risk the $14 million of debt that it "forgave" in January 2018. After all, being junior only to the JPM, the asset-based lender, ArrowMark would have recovered 100% of its term loan had the November 2017 transaction gone forward or, for that matter, the June 2018 transaction. The fact that ArrowMark went forward with the Restructuring is itself compelling evidence that the Staples offer never "came off the table" between November 2017 and June 2018.

137. Third, that BIC was to finalize a transaction with Staples in April 2018 is further evidenced by the fact that BIC engaged East Wind Advisors on May 7, 2018 (or just one week after the window closed for Common Members to exercise their preemptive rights) for the purpose of negotiating a sale to Staples and its parent, Sycamore Partners.

138. In addition to omitting the material fact of an imminent Staples acquisition in the April 23, 2018 letter and accompanying private placement memorandum Howard Brown also **affirmatively requested** that investors forego their preemptive rights with respect to the first $5 million of Class A Preferred Units issued and sold to ArrowMark, asserting that it had been determined by the Board of Managers that it was "appropriate for ArrowMark to invest a minimum of $5 million" in connection with the April 2018 Preferred Equity Offering.

139. As a result of the foregoing, none of the Plaintiffs exercised their preemptive rights, to their detriment.

### L. BIC Insiders Take Nearly All the Proceeds From Staples Acquisition For Themselves and Assign Nearly All Tax Liability to the Common Members

140. On May 31, 2018 BIC and Staples entered into a third, and, as it turned out, final, letter of intent. This letter of intent proposed an acquisition of HiTouch from BIC for a purchase price of $78.5 million in cash, with significant holdbacks.

141. The Staples acquisition closed on June 26, 2018. Staples received 100% of BIC's interest in HiTouch and, to the extent not already owned by HiTouch directly or through its subsidiary MyOP Inc., all of the equity in MyOP LLC.

142. Approximately $37.5 million from the transaction was used to pay off debt and an additional $1.5 million to pay costs related to the transaction, including $550,000 in transaction bonuses to certain BIC Insiders and guaranteed payments to East Wind Advisors per the May 7, 2018 engagement letter.

143. In addition to the transaction bonus, BIC Insiders received substantial cash payments. Each of Howard and Michael Brown received $2 million as consideration for purported non-compete agreements; BIC Insiders received retention bonuses totaling $912,500; signing bonuses to a group of employees including Frisk and Johnson totaled $405,000; and finally, a group of employees including Howard Brown, Michael Brown, Frisk and Johnson were eligible to participate in a Management Incentive Program under which they would be entitled to receive 15% of the proceeds after repayment of the Class A and Class B Preferred Units (and before payment of proceeds to Common Members) up to $3.5 million.

144. Holders of both Class A and Class B Preferred Units received repayment in full of their investments, accrued interest, as required by the Fifth BIC A&R.

145. However, holders of these Class A and Class B Preferred Units also had the right to receive substantial additional proceeds as a result of special priority granted these Unit holders in the following way.

146. Section 5.3 of the Fifth BIC A&R provides the basis for the distribution "available cash".

147. Section 5.3(a) and 5.3(b) of the BIC Fourth Amended & Restated Operating Agreement ("Fourth BIC A&R") (attached as Exhibit 5) and of the Fifth BIC A&R (Section 5 is identical in both) provided for liquidation preferences for Class A and Class B Preferred Units respectively. These subsections give priority of payment to Class A Preferred Units, and required both classes of units to be paid out their entire Liquidation Preference, equal to the original purchase price plus the yield less the cumulative distributions made by BIC.

148. Section 5.3(c) provides for the distribution of the remaining cash, if any, to Common Members.

149. However, Section 5.3(c) also provides that "amounts otherwise distributable to the Common Members in respect of Common Units shall instead be distributed to the Class A Preferred Members and the Class B Preferred Members in proportion to their relative Distribution Percentages to the extent of any amounts distributed by MyOfficeProducts, LLC to MyOfficeProducts Holdings, Inc. pursuant to the Fourth Amended and Restated Operating Agreement of MyOfficeProducts, LLC[.] (the "MyOP Fourth A&R") (attached as Exhibit 6).

150. The MyOP Fourth A&R in turn provides in Section 12(a)(i) for distributions of an "amount equal to the amount distributable pursuant to Section 5.3(a) and 5.3(b) of the Brown (RI) Operating Agreement." The amounts distributable under those Sections of the Fifth BIC A&R, as just noted, are the entirety of the Class A Liquidation preference (or a minimum of $9 million) in Section 5.3(a) and the entirety of the Class B Liquidation preference (or a minimum of $4 million) in Section 5.3(b).

151. These provisions, if triggered, permitted the BIC Insiders to pay out effectively at least a 100% return on investment to the Class A and Class B Preferred Unit Holders, including the BIC Insiders, for what were effectively five-month (or fewer) long investments.

152. Upon information and belief, Section 5.3(c) of the Fifth BIC A&R was triggered following the Staples acquisition largely, if not entirely, for the purpose of compensating ArrowMark (by far the largest holder of Preferred Units) for the debt it "cancelled". The basis of this belief is the following:

153. First, the Restructuring, including the cancellation of debt, took place on exactly the same date, January 31, 2018, as the Fourth BIC A&R and the MyOP Fourth A&R became effective; all these changes were carried out substantially as part of one transaction.

154. Second, the amount of the cancellation of debt from the restructuring, approximately $14 million, is roughly equal to the amount of the liquidation preferences for the Class A and Class B Preferred Units, which were approximately $13.5 million.

155. Third, there does not seem to be any other purpose for Section 5.3(c) or the related provisions in the MyOP Fourth A&R. While HiTouch, MyOP LLC, and MyOP Holdings were all subsidiaries of BIC, no clear logic supports a distribution of cash to preferred unit holders of one company (BIC) triggered solely on the transfer of funds from a subsidiary company (MyOP LLC) to that subsidiary's holding company (MyOP Holdings)  Nor does there appear to be any clear logic to placing this diversion of proceeds immediately before distributions to Common Members, including the Plaintiffs, in the flow of funds. Rather, the only purpose seems to be to allow for a substantially greater recovery for BIC Class A and Class B Preferred Unit Holders based on what appears to be an unrelated, and potentially entirely arbitrary, transfer of funds between an operating subsidiary and its parent.[2]

[2] It should be noted that the operative language of the MyOP Fourth A&R, as well as the agreement as a whole, reflects hasty drafting. The MyOP Fourth A&R has, for example, two sections each numbered as 10, 11, and 12.

156. Fourth, and finally, in light of the allegations stated above, concerning the fact the Restructuring was carried out in order to wring the greatest possible benefits for the BIC Insiders at a time when an acquisition by Staples remained "on the table" upon terms that, at least between BIC and its subsidiaries on one hand and Staples on the other did not materially change, this provision in Section 5.3(c) of the Fourth BIC A&R (and which was carried over intact to the Fifth BIC A&R) provided a mechanism by which the debt ArrowMark "canceled" could be made up.

### M. BIC Common Members, Including the Plaintiffs, Receive Almost No Proceeds But Substantial Tax Liability After the Staples Acquisition

157. In stark contrast to the substantial and tangible benefits lavished upon the BIC Insiders pursuant to the Staples acquisition, the Common Members received payments for their interest amounting to less than 1% of their initial investments. In addition, the vast majority of those already-minimal payments were held back pursuant to the agreement to ensure that BIC and its affiliates lived up to the non-compete and other obligations.

158. Making the deal even worse for the Common Members, all of the Common Members were allocated substantial amounts of ordinary income and capital gains as a result of the Staples acquisition, amounts which grossly exceeded the amounts of their respective cash dollar proceeds from the sale.

159. By way of example, one Common Member, Plaintiff Joseph Aiello, who had invested more than $1.5 million in BIC received a cash distribution of $3,040 as a result of the Staples acquisition. However, he was also assigned ordinary income (from cancellation of debt) in the amount of $777,341 from BIC and capital gains in the amount of $945,791 from MyOP Holdings in K-1s that were issued in the last two weeks of September 2019. Accordingly, on a net basis, and because of the defendants' wrongful acts, this Common Member will not only lose

substantially all of his investment in BIC and, through BIC, in MyOP Holdings but will further be required to pay hundreds of thousands of dollars in taxes to federal and state tax authorities as a result. These allocations to Plaintiff Aiello were substantially greater than the historic basis of pass-through loss and evidenced an intent to avoid the tax burden falling on BIC Insiders and to shift it to the Common Members. The same is true as to the tax allocations made to the other Plaintiffs in proportion to their interest in the common units.

160. On the basis of the K-1s that were issued to the Plaintiffs, it appears that the Common Members as a whole were made liable for approximately $14 million in taxable ordinary income and $30 million in taxable capital gains.

## CAUSES OF ACTION

### First Cause of Action (Against Howard Brown)

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5(b)

161. Paragraphs 1 through 160 above are repeated and realleged and incorporated herein.

162. As described above, the BIC Insiders caused BIC to issue the Class A Preferred Units in January 2018 and Howard Brown informed the Common Members, including Plaintiffs, of their preemptive rights in connection with that issuance in April 2018. Each of the Plaintiffs had the right to participate in this securities offering.

163. Howard Brown, however, failed to inform the Common Members either that negotiations with Staples had resumed no later than January 2018 or that the Staples acquisition was going to proceed in June 2018, material facts as to which he had knowledge, upon information and belief as described above. Moreover, Howard Brown knew that this fact would have been material to the decision of the Common Members, including Plaintiffs, whether or not to exercise those preemptive rights in connection with that offering in the less than five business days that

they were given to decide whether to exercise those rights. Simply put, because of the liquidation preferences that the Class A Preferred Units enjoyed, an acquisition by Staples at the amount offered either in November 2017 or June 2018 would have guaranteed, at a minimum, a riskless return of investment and the defined yield for any person who exercised their preemptive rights.

164. Howard Brown was not only the maker of the statements containing the material omission but also, as Chairman of the Board of BIC, the person with ultimate authority to speak on behalf of BIC concerning such matters. Howard Brown also had motive to derail the Staples acquisitions in November 2017 and June 2018; namely, to place himself and Michael Brown in better financial positions. His participation in the Restructure that permitted Common Members to receive a nominal return as a result of the Staples acquisition, while he walked away with millions, is evidence of his intent to manipulate and defraud the Common Members.

165. The Common Members, including Plaintiffs, reasonably relied on the statements made to them by Howard Brown in April 2018 in deciding not to exercise their preemptive rights, reasonably believing both that there was no prospect of an imminent acquisition by Staples and that it was in the best interests of BIC (and correspondingly their best interests as equity holders of BIC) that they not exercise their preemptive rights. Of course, as it turned out, both of those beliefs were false.

166. The Plaintiffs declined to exercise their preemptive rights on the basis of the omission of the material fact of the imminent Staples acquisition, a fact as to which Howard Brown had actual knowledge, and lost money as a result.

167. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

168. As evidenced above, Howard Brown omitted the material fact relating to the impending Staples acquisition in June 2018 in his April 2018 letter to Common Members, in which he asked them not to evoke their preemptive rights. By following Howard Brown's request and not invoking their preemptive rights, Common Members lost nearly the entirety of their investments and were saddled with the majority of the tax consequences, while Howard Brown, among others, received substantial proceeds. This omission, viewed in conjunction with his participation in the Restructure, is evidence of a "manipulative or deceptive device or contrivance" in relation to a securities transaction, and thus a violation of Section 10(b).

169. Liability under Rule 10b-5 requires a showing of: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance by the plaintiffs; (5) economic loss; and (6) loss causation. Howard Brown made a material omission to Common Members in his April 2018 letter relating to the Staples acquisition. He acted with scienter, proven by his motive and opportunity to commit fraud in making such an omission, as he and his son, Michael Brown, benefitted financially from Common Members not exercising their preemptive rights, which exercise would have diminished his, and others', ability to profit from the scheme. The Plaintiffs relied on this material omission and as a direct result suffered economic losses, in the form of heavy tax consequences while losing almost all of their investments.

## Second Cause of Action (Against the BIC Insiders)

## Federal Securities Fraud In Violation of Section 10(b) of the '34 Act and Rule 10b5 (a,c)

170. Paragraphs 1 through 169 above are repeated and realleged and incorporated herein.

171. As described above, the BIC Insiders caused BIC to issue Class A Preferred Units in January 2018 and informed the Common Members, including Plaintiffs, of their preemptive

rights in connection with that issuance in April 2018. Each of the Plaintiffs had the right to participate in this securities offering.

172. The issuance of the Class A Preferred Units, as well as the issuance of the Class B Preferred Units, around the same time as part of the Restructuring were critical elements of the BIC Insiders' "scheme [or] artifice to defraud" the Commons Members.

173. By simultaneously cancelling debt owed by BIC or its subsidiaries to ArrowMark and issuing preferred securities to ArrowMark in place of that debt, the BIC Insiders generated substantial ordinary losses for ArrowMark while at the same time affecting in no material way ArrowMark's ability to obtain proceeds from the Staples acquisition.

174. Each of the BIC Insiders (except John Frisk) knew of and approved of each of the transactions that were part of the January 2018 Restructuring, as reflected in January 26, 2018 joint board minutes of among other entities, BIC. John Frisk knew of and approved of each of the transactions that were part of the January 2018 Restructuring as evidenced by his signature on the Limited Waiver and Fifth Amendment to Credit Agreement that effected that restructuring.

175. Because the term loan issued by ArrowMark as well as the Class A and Class B Preferred Units were superior in liquidation preference to the interests of the Common Members, moving their interests from one level to another had no effect on the security of their initial investment. Similarly, both the term loan and the Class A and Class B Preferred Units were subordinate to the fully-secured loan from JPM, the asset-backed lender.

176. Moreover, ArrowMark controlled BIC's management after restructuring occurred, meaning it could prevent any occurrence that would jeopardize its position in the "flow of funds" from the Staples acquisition, such as the incurrence of new debt that would be superior in priority to its position of its Class A and Class B Preferred Units. As it turned out, no new debt was incurred

by BIC or its subsidiaries between the January 2018 Restructuring and the consummation of the Staples acquisition five months later.

177. As a result of the foregoing, ArrowMark, through the actions of the BIC Insiders, was able to obtain a minimum of $14 million in ordinary losses that it could use to offset taxable gains. However, in order to obtain these losses, an offsetting amount of taxable ordinary income had to be generated from the cancellation of debt.

178. In order to benefit and enrich themselves at the Common Members' expense, the BIC Insiders decided that the cancellation of debt income should be attributed the Common Members in proportion to their ownership of Common Units.

179. Moreover, notwithstanding BIC's at least potential insolvency, because this cancellation of debt occurred at the "BIC level" and because BIC is a limited liability company, this cancellation of debt income could only be excluded from a Common Member's gross income only if the Common Member was himself insolvent.

180. The Common Members suffered substantial injury as a result of this scheme to defraud.

181. First, as noted above, following the Staples acquisition, the BIC Insiders diverted substantially all of the net proceeds to themselves through direct cash payments, special guaranteed payments, and through use of the liquidation preferences in the Class A and Class B Preferred Units described above, including the Section 5.3(c) diversion of funds otherwise due the Common Members.

182. Second, by generating paper losses through cancellation of debt income for ArrowMark, the BIC Insiders generated corresponding ordinary income gains for Common Members, resulting in millions of dollars in tax liabilities for them.

183. Third, as described above, the Common Members, including Plaintiffs, suffered injury in their reliance on the statements of the BIC Insiders described that were materially misleading as a result of their omission of this material fact, *viz.* they declined to exercise their preemptive rights on the basis of the omission of the material fact of the imminent Staples acquisition. The Class A Preferred Units that were issued in January 2018 and were subject to the exercise of preemptive rights in April 2018 had liquidation preference rights over other securities issued by BIC, including the Common Units held by the Common Members. As a result, the "Class A" Preferred Units paid out not only the full amount of the purchase price but also a substantial return on investment.

184. Each of the Common Members, including Plaintiffs, suffered damages as a result of their failure to exercise their preemptive rights as a result of the scheme to defraud identified above, as well as from the substantial federal and state tax burden imposed on them as a result of this scheme and/or artifice.

185. As previously stated, Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

186. The above sequence of events indicates a "manipulative or deceptive device or contrivance" in relation to at least two securities transactions, resulting in Common Members being defrauded of their investments while BIC Insiders walked away with almost the entirety of the net proceeds from the acquisition having shifted substantial tax consequences to Plaintiffs.

187. Rule 10b5 (a) and (c) makes it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit" "in connection with the purchase or sale of any security."

188. As described in Paragraph 172, *supra*, issuance of Class A and Class B Preferred Units around the same time as part of the Restructuring were critical to the BIC Insiders' "scheme [or] artifice to defraud" the Commons Members, and were keys transactions that permitted BIC Insiders to redistribute the income flows and tax obligations from the Staples acquisition to their benefit and to the detriment of the Common Members, including the Plaintiffs. By engaging in a sham cancellation of debt transaction that lacked "substantial economic effect" for the purposes of creating tax-deductible losses, and then engaging in securities transactions for the purpose, at least in part, of eliminating that loss, the BIC Insiders violated Section 10(b) and Rule 10b5(a,c).

<u>Third Cause of Action (Against David Corkins)</u>

<u>Control Person Liability Under Section 10(b) and Section 20(a) of the '34 Act</u>

189. Paragraphs 1 through 188 above are repeated and realleged and incorporated herein.

190. Section 20(a) states in pertinent part that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action." A plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.

191. Both ArrowMark and HiTouch Nashville are among the BIC Insiders that participated in the Section 10b5(a,c) scheme and/or artifice to defraud described above.

192. David Corkins is the Managing Member of both ArrowMark and HiTouch Nashville and as such is a "control person" of each of those entities as that term is used in Section 20(a).

193. Corkins further had personal knowledge, and accordingly, at least the minimum requisite level of scienter, recklessness, of the scheme and/or artifice to defraud, as reflected by his signatures on the Fourth BIC A&R, which sets forth the key elements the January 2018 Restructuring.

194. Furthermore, given the size of the cancellation of debt (at least $14 million) by ArrowMark that was carried out as part of the January 2018 Restructuring, it is reasonable to conclude that by virtue of his familiarity with the Fourth BIC A&R, Corkins knew both how ArrowMark could recoup its losses, *viz.*, through the Section 5.3(c) mechanism described above (a provision contained in the Fourth BIC A&R) , and further how it could obtain valuable gains, *viz.*, paper losses that could be used to offset ordinary income gains from other sources, with the resulting tax burden being foisted off on the Common Members, including the Plaintiffs.

195. Accordingly, for these reasons, Corkins is liable for the wrongful acts of ArrowMark and HiTouch Nashville as a "control person" under Section 20(a).

<u>Fourth Cause of Action (against the BIC Insiders)</u>

<u>Common Law Fraud Under Delaware Law</u>

196. Paragraphs 1 through 195 above are repeated and realleged and incorporated herein.

197. By engaging in the above-referenced conduct, each of the BIC Insiders further committed fraud under Delaware common law.

198. As described above, defendant Howard Brown omitted a material fact from his April 23, 2018 communications to the Common Members, including Plaintiffs, *viz.*, that Staples was about to acquire BIC's operating subsidiaries.

199. The representations made in that communication were materially misleading as a result of that omission.

200. Howard Brown knew of or recklessly disregarded the significance of that acquisition to the Common Members, including Plaintiffs.

201. Howard Brown intended to induce the Common Members, including Plaintiffs, to rely on these misleading misrepresentations, in order to accomplish his explicitly stated goal of discouraging them from participating in the securities issuance. Each of the Plaintiffs had the right to participate in this securities offering.

202. The Common Members, including Plaintiffs, justifiably relied on the misleading misrepresentation which were made in the materials embodying the securities offering.

203. The Common Members, including Plaintiffs, suffered injury as a result of their justifiable reliance, in that they missed out on the opportunity make an investment that resulted, at a minimum, in a return of 100% of the amount invested and a substantial premium.

204. Upon information and belief, the source of which is their participation in the January 26, 2018 board meeting at which the Restructuring was discussed, or in the case of John Frisk, his signature on at least one key document of, the Restructuring each of the BIC Insiders knew and approved of these offering materials before they were sent to the Common Members, including Plaintiffs.

205. Each of the BIC Insiders took the steps necessary to authorize these materials for distribution with knowledge that the omission of the material fact of the imminent Staples

acquisition was material to the Common Members, including Plaintiffs. By so doing they aided and abetted the fraud carried out by the primary violator, Howard Brown.

Fifth Cause of Action (Against the 2018 Managers)

Breach of the Duty of Good Faith and Fair Dealing

206. Paragraphs 1 through 205 above are repeated and realleged and incorporated herein.

207. By approving the transactions described above, the 2018 Managers breached the duty of good faith and fair dealing they owed to the Common Members, including Plaintiffs.

208. Each of the 2018 Managers had a nonwaivable duty of good faith and fair dealing to the Common Members of BIC, including Plaintiffs.

209. Each of the Common Members, including Plaintiffs, had the right to reasonably rely on the 2018 Managers acting in the interest of the Common Members, consistent with the duty of good faith and fair dealing.

210. By allowing the BIC Insiders to engage in sham transactions in order to generate millions of dollars in paper tax losses for BIC Insider ArrowMark and foist the corresponding tax liability onto the Common Members, including Plaintiffs, the 2018 Managers breached their duty of good faith and fair dealing.

211. By allowing the material information that the Staples acquisition was imminent to be omitted from the April 23, 2018 materials concerning the Class A Preferred Units offering in which each of the Plaintiffs had the right to participate, an omission that made the statements contained therein materially misleading, the 2018 Managers breached their duty of good faith and fair dealing.

212. By allowing millions of dollars from the Staples acquisition were diverted to pay various insiders, including Michael Brown and Howard Brown, for non-compete agreements and

otherwise, that had no economic basis, were unwarranted, and were made part of the transaction solely for the purpose of siphoning value from the Common Members, the 2018 Managers breached their duty of good faith and fair dealing.

213. Each of the Managers knew or should have known about the lack of a proper basis to the January 2018 Restructuring; the omissions of material facts from the April 23, 2018 communications with investors; and the fact that proceeds from the Staples acquisition were being diverted to insiders.

214. The Common Members, including Plaintiffs, were damaged as a result of the January 2018 Restructuring, having incurred millions of dollars in tax liabilities as a result of actions taken by the 2018 Managers in disregard of their duties in order to favor BIC Insider ArrowMark by engaging in a sham cancellation of debt transaction.

215. The Common Members, including Plaintiffs, were damaged as a result of the material omissions in the April 23, 2018 offering materials, having lost out on the opportunity to invest in a profitable investment.

Sixth Cause of Action (Against Howard Brown)

Breach of the Duty of Good Faith and Fair Dealing

216. Paragraphs 1 through 215 above are repeated and realleged and incorporated herein.

217. As described above, in August 2016, Staples and BIC had entered into an agreement in principle under which Staples would acquire BIC's operating subsidiaries for $110 million.

218. In November 2016, Howard Brown prevented this agreement from going forward in order to bargain for millions of dollars in additional cash consideration to be paid to himself and his son Michael Brown by Staples.

219. Staples refused to make such payments, withdrew its original offer, and instead offered to purchase BIC's operating subsidiaries, for approximately $70 million. This offer was rejected by BIC and negotiations terminated.

220. A second round of negotiations with Staples resulted in the Second LOI, under which Staples would have purchased BIC's operating subsidiaries for $76.5 million. Howard Brown again prevented BIC from going forward with this deal, for the stated reason that the equity investors would not obtain a sufficient return. However, the real reason was the Howard Brown wanted to divert more of the proceeds to himself and other BIC Insiders.

221. By engaging in these actions, Howard Brown violated his obligations of good faith and fair dealing to the Common Members (including Plaintiffs), to their resulting injury.

222. If Howard Brown had not reopened negotiations with Staples in November 2016, the Staples acquisition of BIC's operating subsidiaries would have gone forward on the terms described in the August 30, 2016 letter of intent. If that transaction had consummated, the Common Members, including Plaintiffs, would have received the entirety of their original investments and an approximately 30% return on that investment and would further have avoided all of the extraordinary tax consequences that resulted from the January 2018 Restructuring.

223. If Howard Brown had not prevented BIC from going forward with the November 2017 transaction, the Common Members, including Plaintiffs, would have received approximately 12 cents on the dollar returned from their original investment, instead of less than 1 cent on the dollar that they ultimate received. In addition, in that scenario, the Common Members would not have been attributed millions of dollars in ordinary income and capital gains.

Seventh Cause of Action (Against the 2015-2017 Managers and John Frisk)

Breach of Duty of Good Faith and Fair Dealing

224. Paragraphs 1 through 223 above are repeated and realleged and incorporated herein.

225. As described in Paragraphs 217 through 223, in 2016 Howard Brown sought to "re-trade" the agreement in principal BIC had reached with Staples in order to obtain multi-million cash payments for himself and his son Michael Brown, and in 2017 Howard Brown prevented a second proposed acquisition by Staples from going forward because the compensation to him and his son Michael Brown was insufficient.

226. Upon information and belief, each of the 2015-2017 Managers and John Frisk knew that Howard Brown was engaged in such direct negotiations with Staples in November 2016 to obtain benefits personal to him and his son Michael Brown. Upon information and belief, none of the 2015-2017 Managers or John Frisk took any steps to discourage or prevent these direct negotiations for the personal benefit of Howard Brown and Michael Brown. As a result of this attempt by Howard Brown to "re-trade," Staples withdrew from the 2016 agreement in principle.

227. Upon information and belief, each of the 2015-2017 Managers and John Frisk knew that Howard Brown had scuttled the proposed Staples acquisition in November 2017 for his own personal benefit and the benefit of his son Michael Brown.

228. If Howard Brown had not reopened negotiations with Staples in November 2016, the Staples acquisition of BIC's operating subsidiaries would have gone forward on the terms described in the August 30, 2016 letter of intent. If that deal had been consummated, the Common Members, including Plaintiffs, would have received the entirety of their original investments and an approximately 30% return on that investment and would further have avoided all of the extraordinary tax consequences that resulted from the January 2018 Restructuring.

229. If Howard Brown had not prevented BIC from going forward with the November 2017 transaction, the Common Members, including Plaintiffs, would have received approximately 12 cents on the dollar returned from their original investment, instead of less than 1 cent on the dollar that they ultimate received. In addition, in that scenario, the Common Members would not have been attributed millions of dollars in ordinary income and capital gains.

230. Each of the 2015-2017 Managers had non-waivable duties of good faith and fair dealing to the Plaintiffs. As an officer of BIC, John Frisk had the same duties.

231. Accordingly, each of the Common Members, including Plaintiffs, was injured by the breach of the duty of good faith and fair dealing by the 2015-2017 Managers and John Frisk.

Eighth Cause of Action (Against ArrowMark and HiTouch Nashville)

Breach of Fiduciary Duty Under the Bipartisan Budget Act of 2015

232. Paragraphs 1 through 231 above are repeated and realleged and incorporated herein.

233. ArrowMark and HiTouch Nashville were collectively identified as BIC's Tax Representative under the Fourth BIC A&R and the Fifth BIC A&R, and according collectively served as the Tax Representative from at least the January 2018 Restructuring to, upon information and belief, the date of this Complaint.

234. As such, ArrowMark and HiTouch Nashville were "entitled to prepare, file, and amend any tax returns of "BIC". In so doing, however, they owed non-waivable fiduciary duties under federal law to all of the investors in BIC, and because of tax rules regarding disregarded entities, all of the investors in its subsidiaries.

235. These duties were owed to the Common Members, including Plaintiffs.

236. In violation of those duties, ArrowMark and HiTouch Nashville engaged in the above-described scheme to defraud, whereby it, along with others, schemed to generate paper

losses for itself and its affiliates through sham cancellation of debt transactions. The consequence of these transactions was that the Common Members, including Plaintiffs, incurred millions of dollars in tax liabilities as a result of cancellation of debt income being attributed to them. As Tax Representative, ArrowMark and HiTouch Nashville had sole control over the information on the K-1s issued to the Common Members and used that control to the benefit of themselves and their affiliates and to the detriment of the Common Members, including Plaintiffs.

237. In further violation of their fiduciary duties, ArrowMark and HiTouch Nashville, with the help of others, reorganized the tax treatment of the MyOP Inc. transfer of control shares for MyOP LLC in 2012 in order to generate millions of dollars in capital gains income for the Common Members, including Plaintiffs, for the 2018 tax year. As Tax Representative, ArrowMark and HiTouch Nashville had sole control over the information on the K-1s issued to the Common Members. By reorganizing the tax treatment for MyOP LLC for 2012, ArrowMark and HiTouch Nashville used that authority for the benefit of themselves and to the detriment of the Common Members, through the distribution of millions of dollar in capital gains income from ArrowMark and HiTouch Nashville and their affiliates on the one hand to the Common Members, including Plaintiffs, on the other.

238. To establish liability for breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed a fiduciary duty and that the defendant breached that duty. As indicated above, ArrowMark and HiTouch Nashville, as Tax Representatives, owed Common Members a fiduciary duty, requiring they act in the best interests of the Common Members. By acting in a manner beneficial to their own interests and in a manner not fair to the Common Members, they breached this duty when they took the actions described above.

Ninth Cause of Action (Against BIC Insiders and 2018 Managers)

Negligence

239. Paragraphs 1 through 238 above are repeated and realleged and incorporated herein.

240. In the alternative, each of the BIC Insiders and the 2018 Managers had an obligation to exercise the care that a reasonably prudent person would have exercised in handling investments made by others.

241. By engaging in the acts above, which caused in the loss of virtually the entire investments of the Common Members, including Plaintiffs, and caused the Common Members, including Plaintiffs, to incur of millions of dollars in federal and state tax liability, the BIC Insiders and 2018 Managers violated that standard of care. This breach of that duty proximately caused injury to the Common Members, including the Plaintiffs, to wit, the loss of their entire investments and the incurring of tax liability for millions of dollars in capital gains and ordinary income attributed to them.

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a. Compensatory damages in an amount to be determined at trial, including, without limitation, those damages arising from federal and state tax liability caused by the distribution of ordinary income and capital gains to Plaintiffs;

b. Pre-judgment and post-judgment interest;

c. Punitive damages against Defendants in an amount to be determined at trial;

d. An order awarding disbursements, costs, and attorneys' fees; and

e. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
October 18, 2019

Andrew St. Laurent
Harris St. Laurent LLP
40 Wall Street, 53rd Floor
New York, NY 10005
Tel: (646) 248-6010
andrew@hs-law.com

*Attorneys for Plaintiffs*