**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH AIELLO, MATTHEW DRAPKIN, ESTATE OF DONALD DRAPKIN, MICHAEL J. PALMER, MICHAEL J. PALMER AND VIRGINIA A. PALMER LIVING TRUST, ADAM BERK, ROBERT SCHECTERSON, AMY GRABINO, ANTHONY CAVALIERI, MELVIN GOLDBERG, LAWRENCE KAYE, ANN KAYE, LAWRENCE G. KAYE AND H. ANNE KAYE 1996 REVOCABLE LIVING TRUST, TERRY WEBER, JOHN HELM, BRIAN KAFFEE, STUART KAFFEE, KAFFEE CO. LLC, JASON PALMER, PAUL SWISTAK, JAMES TISONY, and DAVID SNIDER,

Plaintiffs,

v.

HOWARD BROWN, MICHAEL BROWN, HITOUCH NASHVILLE LLC, ARROWMARK COLORADO HOLDINGS, LLC, DAVID CORKINS, STEVEN M. GOLDMAN, JOHN EISINGER, MICHAEL NOVOSELLER, SANJAI BHONSLE, KAREN REIDY, DANA STAGGS, JOHN FRISK, ANDREW KOHN, MICHAEL CORNELL, LES GOODMAN, ANDREW KOVACH, JAY NADEL, and RANDI SIDGMORE,

Defendants,

BROWN (RI) INVESTMENT COMPANY, LLC,

A Required Party.

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

No. 19 Civ. 9647 (AT)

Plaintiffs, Joseph Aiello, Matthew Drapkin, the Estate of Donald Drapkin, Michael J. Palmer, the Michael J. Palmer and Virginia A. Palmer Living Trust, Adam Berk, Robert Schecterson, Amy Grabino, Anthony Cavalieri, Melvin Goldberg, Lawrence Kaye, Ann Kaye, Lawrence G. Kaye and H. Anne Kaye 1996 Revocable Living Trust, Terry Weber, John Helm,

Brian Kaffee, Stuart Kaffee, Kaffe Co. LLC, Jason Palmer, Paul Swistak, James Tisony and David Snider (together, "Plaintiffs") holders of common units of Brown (RI) Investment Company LLC ("Brown Investment Company" or "BIC"), by and through their undersigned counsel, bring this Complaint against HiTouch Nashville, LLC; ArrowMark Colorado Holdings, LLC; a "control person" of both those entities; and certain of BIC's current and former managers and affiliates. Plaintiffs hereby demand a trial by jury.

## INTRODUCTION

1. Since 2007, BIC functioned as a holding company for a portfolio of businesses within the office services and supply industry, including Rentacrate, Inc. ("Rentacrate"), HiTouch Business Services, LLC ("HiTouch"), MyOfficeProducts, LLC ("MyOp LLC"), and MyOffice Products Holdings, Inc. ("MyOP Holdings").

2. After years of financial struggle, BIC was able to reach an agreement in principle to sell its operating subsidiaries to Staples Inc. ("Staples") in August 2016. However, at the eleventh-hour, BIC's Chairman Howard Brown refused to allow that transaction to go forward unless he and his son Michael Brown received millions of dollars in excessive and unwarranted payments for non-compete agreements. Staples refused, and the deal fell apart in November 2016. The Managers on BIC's Board at that time were aware of Howard Brown's intentions and allowed him to sabotage the acquisition.

3. BIC was able to revive the deal and reached another agreement in principle with Staples in April 2017. However, BIC's insiders again prevented this deal from going forward. Rather, in order to squeeze more value for themselves from the sale of the financially troubled BIC, the BIC Insiders (as defined in Paragraph 47) engaged in the "Restructuring"—a series of complex transactions, including two issuances of securities, through which the BIC Insiders not

only dramatically diluted the holders of BIC's common units (the "Common Members"), including the Plaintiffs, but also made the Common Members liable for millions-of-dollars in taxable income when the Staples acquisition ultimately went forward in June 2018.

4. As a result, the Common Members, including the Plaintiffs, lost almost their entire investments. At the same time, while receiving almost none of the cash proceeds from the acquisition, they were charged with almost all of the negative tax consequences flowing from it. These negative tax consequences caused the Common Members, including the Plaintiffs, to collectively *lose* millions of dollars—over and above their investment losses in the form of tax consequences paid on behalf of the Defendants—when Staples acquired BIC's operating subsidiaries in 2018.

5. By structuring transactions for the purpose of depriving the Common Members of the benefit of their investments and by omitting material facts from offering materials for securities offerings, certain Defendants committed securities fraud in violation of Rule 10b5(b) and 10b5(a,c); common law fraud; and certain Defendants violated the implied covenant of good faith and fair dealing under Delaware law. One Defendant is liable under Section 20(a) of the 1934 Securities Exchange Act. Certain Defendants also violated fiduciary duties to the Common Members and certain Defendants acted with gross negligence in regards to the Plaintiffs' investments.

## Jurisdiction and Venue

6. This Court's jurisdiction is based upon 28 U.S.C. §§ 1331 and 1332; and Section 27 of the 1934 Securities Exchange Act, 15 U.S.C. §77aa.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c); 29 U.S.C § 1132e(2); and Section 17 of the 1934 Act.

8. Paragraph 13.5 of BIC's Fifth Amended and Restated Operating Agreement (the "Fifth BIC A&R") (attached hereto as Exhibit 1) provides that this litigation may only be brought in the state and federal courts located in the Southern District of New York.

## The Parties

### Plaintiffs

9. Plaintiff Joseph Aiello is or was a holder of 2,824 BIC common units.[1] He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

10. Plaintiff Matthew Drapkin is or was a holder of 795 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

11. Plaintiff Estate of Donald Drapkin is or was a holder of 3,438 BIC common units. Donald Drapkin continuously held units in BIC since 2007 and those units are now the property of the estate. Donald Drapkin and/or his estate was a unitholder of BIC at the time of the wrongdoings complained of. Neither Donald Drapkin nor his estate exercised preemptive rights in connection with the April 2018 securities offering.

12. Plaintiff Michael Palmer, through Plaintiff Michael J. Palmer and Virginia A. Palmer Living Trust, is or was a holder of approximately 2,245 BIC common units. The Michael J. Palmer and Virginia A. Palmer Living Trust was a unitholder of BIC at the time of the

---

[1] In 2017 or 2018, BIC recalculated the numbers of common units resulting in a diminishment in the gross numbers of common units held by the Plaintiffs. *See* Capital Table, attached as Schedule A to Exhibit 1 attached hereto. Because it appears that BIC included previously purchased preferred units for at least some Plaintiffs in performing the calculations that resulted in Schedule A, Plaintiffs here have identified their common units held pre-recalculation. In any event, each of the Plaintiffs is and was a holder of common units at all relevant times.

wrongdoings complained of. The trust did not exercise its preemptive rights in an April 2018 offering of Class A Preferred securities.

13. Plaintiff Adam Berk is or was a holder of 394.50 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

14. Plaintiffs Robert Schecterson and Amy Grabino together own or owned 327 BIC common units. They were unitholders of BIC at the time of the wrongdoings complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

15. Plaintiff Anthony Cavalieri is or was a current holder of approximately 1,274 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

16. Plaintiff Melvin Goldberg is or was a holder of 763 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

17. Plaintiffs Lawrence Kaye and Ann Kaye, through Plaintiff Lawrence G. Kaye and H. Anne Kaye 1996 Revocable Living Trust, own or owned approximately 519 BIC common units. They were unitholders at the times of the wrongdoings complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

18. Plaintiff Terry Weber is or was a holder of 311.50 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

19. Plaintiff John Helm is or was a holder of 186 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

20. Plaintiffs Brian Kaffee and Stuart Kaffee together, through Plaintiff Kaffee Co. LLC, own or owned 265 BIC common units and were unitholders at the times of the wrongdoings complained of. They did not exercise their preemptive rights in an April 2018 offering of Class A Preferred securities.

21. Plaintiff Jason Palmer is or was a holder of 232 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

22. Plaintiff Paul Swistak is or was a holder of 29 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

23. Plaintiff James Tisony is or was a holder of approximately 138 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

24. Plaintiff David Snider is or was a holder of approximately 250 BIC common units. He was a unitholder of BIC at the time of the wrongdoings complained of. He did not exercise his preemptive rights in an April 2018 offering of Class A Preferred securities.

**Defendants**

25. Howard Brown is a founder, and at all relevant times, a Manager of BIC and serves or served as BIC's Chairman.

26. Michael Brown is Howard Brown's son. He is, and was at all relevant times, a Manager of BIC.

27. During the entire period from October 2015 to October 2019 (when BIC issued the 2018 schedule K-1s to its members), Michael Brown (as Manager) and Howard Brown (as Chairman of the BIC Board of Managers) were authorized by the relevant operating agreements to take action on behalf of BIC and they were intimately involved with the day-to-day management of BIC and its subsidiaries. They caused BIC to take certain key actions, including, without limitation: (1) adopting the First Amendment to BIC's Third Amended and Restated Operating Agreement, which allowed the BIC Board of Managers to take critical action without the consent of the Common Members; (2) all transactions associated with the Restructuring; (3) negotiating and effectuating the terms of the Staples acquisition, including transaction and retention bonuses to certain BIC Insiders. Without their knowledge and consent, none of the foregoing transactions could have gone forward.

28. John Frisk ("Frisk") was and, upon information and belief, remains the President of BIC's operating entities both before and after BIC's acquisition by Staples and, as President, managed the everyday affairs those entities. He was a Manager of BIC from at least January 2018 to June 2018, and regularly participated in BIC's management before then. He was also one of the primary contacts for the Staples mergers and acquisitions team (alongside Howard Brown) from at least 2016 to 2018. He also spoke with members of the Staples team in an "off-the-record" capacity during the same period. In connection with the Restructuring, Frisk purchased 608 Class A Preferred Units in BIC for the aggregate purchase price of $100,000.00. He also received a $200,000.00 sign-on bonus paid out of the net proceeds of the Staples acquisition and became eligible for a retention bonus of up to $275,000.00.

29. ArrowMark Colorado Holdings LLC (a/k/a Arrowpoint Asset Management LLC and operating under the trade name ArrowMark Partners) ("ArrowMark") is a limited liability company formed under the laws of Delaware with its principal place of business at 100 Fillmore Street, Suite 325, Denver, Colorado 80206. ArrowMark was formerly known as Arrowpoint Agency Services, LLC, and entered into, under that name, the October 29, 2015 credit agreement with BIC and BIC's subsidiaries and affiliates, among other agreements. No later than the January 31, 2018, it had changed its name to ArrowMark. For the purposes of clarity, this entity is referred to throughout as "ArrowMark".

30. HiTouch Nashville LLC ("HiTouch Nashville") is a limited liability company formed on January 30, 2018 under Delaware state law, with its headquarters in Nashville, Tennessee.

31. ArrowMark and HiTouch Nashville have collectively been the Tax Representative for BIC from at least January 31, 2018 to the present.

32. From at least October 2015 to October 2019 (when BIC issued the 2018 schedule K-1s to its members), ArrowMark and/or HiTouch Nashville exercised control over the affairs of BIC. Throughout this time, ArrowMark and/or HiTouch Nashville were consistently represented on the BIC Board of Managers by an "ArrowMark Representative" and BIC was required to obtain the express consent of the ArrowMark Representative before it could take at least 25 corporate actions, including filing for bankruptcy—an option that would have yielded a significantly better outcome for the Common Members.[2] In addition, during this time, ArrowMark exercised *de facto*

[2] As described in more detail below, as a result of the Restructuring, following the Staples Acquisition, Plaintiffs lost millions of dollars instead of receiving any return on their investment. For example, Plaintiff Joseph Aiello received cash payments of approximately $3,040 but was forced to recognize approximately $1.5 million in phantom income, on which he was required to,

power over BIC as its "lender of last resort," *viz.*, the only available source of additional capital for BIC.

33. From January 2018 to October 2019, ArrowMark and HiTouch Nashville exercised formal control over BIC by virtue of their right to appoint the majority of the BIC Board of Managers (as well as a majority of managers to the boards of several BIC subsidiaries) and through their position as the BIC Tax Representative. ArrowMark and HiTouch Nashville caused BIC to effectuate certain key transactions (which are outlined in detail herein), including (without limitation): (1) adopting the First Amendment to BIC's Third Amended and Restated Operating Agreement, which allowed the BIC Board of Managers to take critical action without the consent of the Common Members; (2) all actions associated with the Restructuring; (3) the cancellation of millions-of-dollars in BIC's debt; and (4) the allocation of negative tax consequences almost exclusively to the Common Members. Without their knowledge and consent, none of the foregoing transactions could have gone forward.

34. David Corkins served as ArrowMark's Managing Member at all relevant times, with the power to direct the activities of ArrowMark. Upon information and belief, David Corkins served as HiTouch Nashville's Managing Member at all relevant times, with the power to direct the activities of HiTouch Nashville. The basis of this belief is the signature of Mr. Corkins as the official representative of those entities on the Written Consent of the Members of BIC, effective as of January 31, 2018, adopting the Fourth Amended and Restated Operating Agreement and

---

and did, pay hundreds of thousands of dollars in local, state and federal income taxes. *See* ¶ 170 *infra*. By contrast, had BIC simply declared bankruptcy, Aiello and the Common Members would not have suffered the adverse tax consequences that they did, and, accordingly, would have been in a much better financial position, even if they would not have received, in that scenario, any of the *de minimis* cash payments.

effectuating the Restructuring, and his signature on the Fourth Amended and Restated Operating Agreement itself. (*See* Exhibit 7, p. 3666; Exhibit 5 at 3409; 3411).

35. Steven M. Goldman ("Goldman") is a lawyer and a partner at Kramer, Levin, Naftalis and Frankel, LLP ("Kramer Levin"), a law firm and BIC's longtime outside legal counsel. He was a Manager of BIC from 2015 to 2017 and was a Manager of MyOP Holdings, a BIC subsidiary. At all relevant times—even when he no longer served as a BIC Manager—Goldman was present at the joint meetings between the BIC Board of Managers and its subsidiaries, served as Secretary in those meetings (including the January 2018 meeting where the actions needed for the Restructuring were ratified), and actively participated in BIC's everyday management, including with respect to the drafting of BIC's corporate documents. Goldman was a long-time investor in BIC and, in connection with the Restructuring, Goldman purchased 3,952 Class A Preferred Units in BIC for the aggregate purchase price of $650,000.00. In addition, Kramer Levin received $325,000.00 paid out of the net proceeds of the Staples acquisition.

36. John Eisinger ("Eisinger") is or was a managing director of ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least May 2018. At the June 25, 2018 Board of Managers meeting, Eisinger approved the terms of the Staples acquisition, as well as the Management Incentive Program, pursuant to which the Board authorized substantial cash "incentive" payments to certain BIC Insiders.

37. Michael Novoseller ("Novoseller") is or was a managing director of ArrowMark and is or was an "ArrowMark Manager" for BIC from at least October 2015 to April 2018. He was active in the everyday business of BIC and wielded significant influence over the company by virtue of his special relationship with BIC as "ArrowMark Manager." From October 2015 to April 2018, without Novosller's explicit approval, BIC **could not** take over 25 corporate actions,

including (without limitation) recapitalizing BIC, offering employment to or terminating any senior executive officer, changing the size of the Board of Managers, or making any material acquisitions or dispositions of assets of BIC or its subsidiaries. (*See* Exhibit 2, pp. 174-175).

38. Sanjai Bhonsle ("Bhonsle") is a partner and portfolio manager for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least January 2018. At the June 25, 2018 Board of Managers meeting, Bhonsle approved the terms of the Staples acquisition, as well as the Management Incentive Program, pursuant to which the Board authorized substantial cash "incentive" payments to certain BIC Insiders.

39. Karen Reidy ("Reidy") is a partner and portfolio manager for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least January 2018. At the June 25, 2018 Board of Managers meeting, Reidy approved the terms of the Staples acquisition, as well as the Management Incentive Program, pursuant to which the Board authorized substantial cash "incentive" payments to certain BIC Insiders.

40. Dana Staggs ("Staggs") is an investment analyst for ArrowMark and is or was one of the four "ArrowMark Managers" for BIC from at least May 2018. At the June 25, 2018 Board of Managers meeting, Staggs approved the terms of the Staples acquisition, as well as the Management Incentive Program, pursuant to which the Board authorized substantial cash "incentive" payments to certain BIC Insiders.

41. Andrew Kohn ("Kohn") was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary. In connection with the Restructuring, Kohn purchased 304 Class A Preferred Units in BIC for the aggregate purchase price of $50,000.00.

42. Michael Cornell was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

43. Les Goodman was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary. Goodman was Chair of the Audit Committee from at least 2015-2018. Upon information and belief, during this period, Goodman's knowledge and/or approval would have been required for any decision that impacted BIC's financial condition, including, without limitation: changes to BIC's accounting methods; the reallocation of company debt; banking default issues and remedies; and decisions pertaining to legal matters that could impact BIC's audited financial statements.

44. Andrew Kovach ("Kovach") was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary. In connection with the Restructuring, Kovach purchased 152 Class A Preferred Units in BIC for the aggregate purchase price of $25,000.00.

45. Jay Nadel was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary.

46. Randi Sidgmore ("Sidgmore") was a Manager of BIC from 2015 to 2017 and also was a Manager of MyOP Holdings, a BIC subsidiary. In connection with the Restructuring, Sidgmore purchased 1,520 Class A Preferred Units in BIC for the aggregate purchase price of $250,000.00.

47. HiTouch Nashville, ArrowMark, Howard Brown, Michael Brown, Steven Goldman, and John Frisk (the "BIC Insiders") directly or through their employees or agents controlled the operations of BIC at all relevant times.

48. Howard Brown, Michael Brown, John Frisk, Michael Novoseller, John Eisinger, Sanjai Bhonsle, Karen Reidy and Dana Staggs served as elected Managers of BIC for some or all

of the period from January 2018 to at least June 2018, with all the rights and responsibilities associated therewith (the "2018 Managers").

49. Howard Brown, Michael Brown, Steven Goldman, Andrew Kohn, Michael Cornell, Les Goodman, Andrew Kovach, Jay Nadel, Randi Sidgmore, and Michael Novoseller served as elected Managers of BIC and MyOP Holdings for some or all of the period from 2015 to 2017, with all the rights and responsibilities associated therewith (the "2015-2017 Managers").

50. BIC is identified herein as a necessary party, insofar as it is subject to service of process and because: in the absence of that party the Court may not be able to accord complete relief; BIC has an interest in the subject matter of this litigation; and omitting BIC from this litigation could both affect its ability to protect its interest in this litigation and expose it to a substantial risk of inconsistent obligations following the results of this litigation.

## FACTS

51. As described in more detail below, the causes of action in this case arise from transactions in at least four closely-related entities: Brown Investment Company, the entity through which the Common Members, including Plaintiffs, made their investments and the ultimate parent for the other entities; HiTouch, an operating company; MyOfficeProducts, Inc. ("MyOP Inc."), which was reformed into MyOP LLC, an operating company and also a Delaware LLC; and MyOP Holdings, a Delaware corporation that has made a subchapter S election.

52. BIC was formed in 2007 for the purpose of investing in operating subsidiary companies within the office services and supply industry.

53. BIC owns 100% of HiTouch.

54. In November of 2010, HiTouch acquired MyOP Inc.

55. Pursuant to the Amended and Restated Operating Agreement dated June 1, 2007 ("First BIC A&R"), BIC offered only one class of membership interest to its members. Section 4.2 of the First BIC A&R also granted its members preemptive rights – the right to first subscribe for his or her *pro rata* share of any new equity issuance on the same terms and conditions proposed to be offered. This provision remained constant throughout the various iterations of the operating agreements to come.

56. As of January 1, 2012, MyOP Inc. was converted to an LLC for tax purposes – MyOp LLC.

57. The newly created MyOp LLC then distributed 100% of its preferred units and 5% of its common units to the newly created formed holding company, MyOp Holdings.

58. On or about February 17, 2012, BIC initiated a junior secured subordinated note offering to raise working capital for HiTouch and MyOp LLC. In an e-mail to BIC Common Members, Kramer Levin represented that if BIC did not raise at least $3 million in notes, it would likely cancel the offering and, instead, make a capital call from the members who held capital call units. Upon information and belief, BIC ultimately raised more than $3 million in notes.

59. The promissory notes issued in connection with the offering were due to mature on July 31, 2015.

**A. <u>ArrowMark Gradually Takes Control Of BIC</u>**

60. After years of generally productive business, BIC began to experience cash flow issues in 2014 and 2015 that threatened its ability to repay the 2012 promissory notes. To alleviate the strain, BIC (through its subsidiaries) entered two credit facilities in late 2015: one with JP Morgan Chase Bank N.A. ("JPM") and the other with ArrowMark.

61. On October 29, 2015, HiTouch, MyOp LLC, and Rentacrate entered an asset-backed credit agreement with JPM (the "ABL Agreement"). The ABL Agreement allowed the companies to borrow up to $35 million, limited to a percentage of their respective accounts receivable and certain inventory. BIC and MyOP Holdings guaranteed the debt of their respective subsidiaries under the ABL Agreement.

62. On October 29, 2015, BIC also entered a term loan credit facility with ArrowMark in the total amount of up to $27.5 million, plus up to an additional $10 million (the "Term Loan Agreement").

63. Simultaneously upon executing the Term Loan Agreement, the BIC Board issued to ArrowMark and certain of its co-investors preferred units – a new class of ownership interest in BIC (the "Preferred Unit Offering") on very favorable terms. The Board also issued to ArrowMark common units representing approximately 4% of the issued outstanding common units for no additional consideration (the "Equity Kicker"). Ultimately, ArrowMark purchased approximately $7.5 million in preferred units.

64. The Third BIC Amended and Restated Operating Agreement ("Third BIC A&R") (attached as part of Exhibit 2) also provided ArrowMark with a seat on the BIC Board of Managers. According to Section 2.15, the Board was prohibited from taking certain actions without the approval of the ArrowMark board member ("ArrowMark Representative"), including filing for bankruptcy; entering material acquisitions or dispositions of stock or assets; issuing junior, senior, or *pari* equity; or causing a change of control that would **not** result in the Preferred Members receiving the maximum amount of distributions on their investments. Defendant Michael Novoseller was appointed the ArrowMark Representative under the Third BIC A&R.

65. From October 2015 through June 2018, ArrowMark continuously held at **least** one seat on the BIC Board of Managers. Further, during the critical moments from November 2017 to June 2018, ArrowMark held *de facto* and/or *de jure* ability to control the corporate affairs of BIC. ArrowMark, through the ArrowMark Representative(s), used its power to ensure it obtained the best possible outcome for itself, to the detriment of the Common Members.

**B. BIC Defaults Under the ABL Agreement, Significantly Worsening its Financial Position**

66. Less than three months after entering the ABL Agreement with JPM, BIC defaulted. On January 21, 2016 JPM sent BIC (through its subsidiary HiTouch) a letter outlining the events of default. JPM, however, agreed to waive the claimed events of default upon certain conditions.

67. Faced with additional liquidity issues, on January 20, 2016, HiTouch and MyOp LLC entered into an agreement with Essendant, Inc., ("Essendant") a wholesaler of office supplies and one of BIC's principal vendors. Under that deal, Essendant agreed to pay a one-time fee in the amount of $12.5 million in exchange for HiTouch and MyOp LLC's commitment to make $105 million in total purchases in the first year of the agreement, and $125 million per year thereafter.

68. Meanwhile, with ArrowMark now acting as a BIC lender, preferred equity holder, and manager, the BIC Board began to look for a strategic buyer. To that end, by April 2016, the Board had entered acquisition negotiations with Staples.

**C. BIC Again Defaults on Its Loan Agreement with JPM**

69. BIC and Staples negotiated over the potential sale of BIC subsidiaries HiTouch and MyOP LLC between April and August 2016. By August 30, 2016, BIC and Staples had negotiated

and fully-executed a Letter of Intent (the "First LOI"). Upon information and belief, the acquisition was scheduled to close within 60 to 90 days thereafter.

70. The First LOI provided that Staples would acquire HiTouch and MyOp LLC for a total of $110 million in cash.

71. By November 2016, with the closing imminent, BIC's subsidiaries undertook significant transition of services and planning with Staples.

72. JPM issued another notice of default under the ABL Agreement to BIC, HiTouch, MyOp LLC, and MyOp Inc. in November 2016. As of the date of default, the amounts outstanding under the ABL Agreement totaled approximately $26.7 million. However, JPM executed a second forbearance agreement on November 15, 2016, **conditioned on the agreement (contained in a side letter agreement of the same date) by BIC and MyOp Inc. to sell all their equity interests in HiTouch and MyOp LLC to Staples by November 30, 2016, as contemplated in the First LOI**, with the transaction to close no later than January 31, 2017. The entities promised to satisfy all of their obligations under the ABL Agreement in full, from the sales proceeds.

### D. Howard Brown Blows Up the First Staples Acquisition with the Knowledge and Authorization of the 2015-2017 Managers

73. The acquisition fell apart because, as explained below, Staples would not accede to Howard Brown's eleventh-hour demands that Staples make certain multi-million-dollar direct payments to both himself and Michael Brown as part of the consideration for the acquisition.

74. As noted above, on August 30, 2016 Staples had extended a "best and final" offer for the acquisition of HiTouch and MyOP Inc. for a proposed purchase price of $110 million. This "best and final" offer included as a condition that certain "key employees" continue to work for those entities after the acquisition.

75. During the course of the negotiations following the execution of the First LOI, it developed that Staples was not interested in keeping Michael Brown employed after the acquisition. Howard Brown was going to remain temporarily as a consultant.

76. Realizing that Staples would not continue to pay his or his son's six-figure salaries (at approximately half-a-million dollars each) post-acquisition or his for very long, Howard Brown sought to re-negotiate the deal to obtain millions-of-dollars in value for himself and his son by way of direct payments linked to non-compete agreements.

77. The 2015-2017 Managers were aware that Howard Brown was going to engage in self-dealing that could (and would) put the Staples acquisition at risk and place BIC in an untenable financial situation. On October 31, 2016, in a Joint Meeting between the Boards of BIC and its subsidiaries, Howard Brown explained how the proceeds of the Staples transaction would be distributed, including the possibility that $3 million would be paid to himself and Michael Brown for non-compete agreements that Staples neither needed nor wanted.

78. Through a Board resolution, the 2015-2017 Managers specifically authorized Howard Brown to engage in the foregoing self-dealing and re-trading of the deal terms with Staples, notwithstanding the obvious fact that Howard Brown was negotiating for his and his family's benefit, and not in the interests of BIC's Common Members, including the Plaintiffs.

79. Staples refused to change the terms of its offer to accommodate multi-million payments for non-compete agreements.

80. Howard Brown's eleventh-hour attempt to renegotiate material terms in the First LOI caused the deal to fail. As Michael Brown wrote to Joseph Aiello in November 2016, Howard Brown "just needs to shut his mouth and the deal will get done."

81. As a result of Howard Brown's continued attempts to seek these payments (which the 2015-2017 Managers explicitly authorized), the Staples mergers and acquisitions ("M&A") team became wary of moving forward under the original terms and, on or about November 22, 2016, Staples slashed its proposed purchase price by $40 million, reducing the offer for HiTouch and MyOP LLC to approximately $70 million.

82. In a desperate attempt to salvage the deal, on or about November 27, 2016, Michael Brown reached out to Staples and offered to reduce the original purchase from $110 million to $100 million.

83. Staples rejected Michael Brown's proposal and terminated negotiations.

### E. <u>BIC's Financial Situations Grows Even More Perilous</u>

84. With the Staples acquisition off the table, at least for the moment, BIC scrambled to secure additional capital to meet its existing obligations and fund day-to-day operations. Moreover, BIC was in explicit default of the November 5, 2016 forbearance agreement with JPM, which **required** BIC to consummate the Staples acquisition as contemplated in the First LOI.

85. On December 1, 2016, BIC attempted secure an additional $10 million set-aside from Essendant which it would use to pay MyOp LLC's obligations under the existing supply agreement, which were quickly coming due in January. That failed. On December 5, 2016, Essendant informed Howard Brown that it would not extend further credit to MyOp LLC.

86. Hours later, Howard Brown circulated a letter to investors. Despite the bleak financial outlook for BIC and its subsidiaries following the failed Staples acquisition, he painted a misleadingly positive picture of the state of the companies.

87. First, Howard Brown informed investors that Staples, BIC, and MyOp Inc. had "mutually decided" to terminate negotiations. He offered no reason for the termination to BIC's

Common Members, choosing to omit the fact that his eleventh-hour attempt to secure a better deal for himself and his family caused Staples to reduce its originally proposed purchase price by almost 40%.

88. The December 5, 2016 letter also omitted the material fact that by failing to finalize a deal for the Staples acquisition by November 30, 2016, BIC was in default of the November 15, 2016 Forbearance Agreement with JPM, although the letter did note that HiTouch was "out of compliance with some of the requirements contained in our borrowing facilities and was working with . . . lenders to determine a new course and action plan."

89. To try to raise working capital for the failing subsidiaries, Howard Brown used the December 5, 2016 letter to gauge investors' interest in a $5 to $10 million preferred equity offering. He noted that an internal raise would be "far less punitive" to the Common Members in terms of dilution than an injection of outside capital.

90. In a January 9, 2017 letter, however, Howard Brown informed investors that the preferred equity offering would not be going forward, but that there would instead be a Convertible Note Offering. Like the December 5, 2016 letter, the letter to investors also omitted or misstated key facts.

91. Among other things, Howard Brown noted that BIC and its subsidiaries had entered into another agreement with JPM (the "Amended and Restated Forbearance Agreement"), although he neither identified that agreement as a forbearance agreement nor stated that, as previously noted, BIC's failure to close the Staples acquisition by November 30, 2016 constituted a default under the November 15, 2016 Forbearance Agreement with JPM.

92. Howard Brown also stated that the Carl Marks Advisory Group ("Carl Marks") was hired at BIC's "senior lender's request" to "review and advise" the company on its financial

position, understanding the true facts: that JPM had **required** that BIC retain Carl Marks to regularly review its financials (and give JPM unfettered access thereto) and deliver an Assessment Report to JPM **as a condition** of the Amended and Restated Forbearance Agreement.

93. Further, Howard Brown framed the Convertible Note Offering as a way to simply "bridge the timing gap" until BIC and its lenders could come up with a long-term solution to its liquidity issues. However, given existing market conditions and BIC's credit constraints, that the only "long term solution" would be an acquisition, as the BIC Insiders knew or should have known.

### F. BIC and ArrowMark Restructure and Take Out New Loans to Satisfy its Existing Creditors While Reopening Acquisition Discussions with Staples

94. No later than March 2017, BIC and Staples reopened acquisition negotiations. Until a deal could be reached, however, BIC and its subsidiaries had to cure its existing defaults with several creditors.

95. Accordingly, in March 2017, BIC and ArrowMark modified the Term Loan Agreement, apparently for the **fourth** time. Pursuant to the modified terms, ArrowMark increased its total Term Loan to $30.9 million (plus capitalized interest). BIC took out two other loans, one of which was also from ArrowMark. JPM also agreed to execute a Second Amended and Restated Forbearance agreement dated March 31, 2017, extending the existing forbearance date to December 29, 2017. As of March 31, 2017, the total amount still owing under ABL Credit Agreement was approximately $20 million.

96. Through these measures, BIC Insiders were able to buy additional time to finalize an acquisition deal with Staples.

97. On April 14, 2017, Staples and BIC executed a second letter of intent (the "Second LOI"). Staples decreased the proposed purchase price of HiTouch and MyOp LLC by more than

$30 million - from $110 million to $76.5 million, subject to a further 10% holdback to secure BIC's post-closing obligations.

98. The Second LOI contained an explicit provision providing that Staples would pay $3 million to each of Michael Brown and Howard Brown as "additional consideration" for their agreement to enter noncompete agreements.

99. Such "additional consideration" had not been included in the First LOI, although, as noted above, it had been injected into the previous negotiations at a late stage.

100. Despite Howard Brown's demonstrated re-trade of and self-dealing in the 2016 negotiations, each of the 2015-2017 Managers authorized Howard Brown to act as agent for BIC in renewed negotiations with Staples in 2017. Indeed, in a June 27, 2017 e-mail sent an email to numerous HiTouch officers and employees, John Frisk again acknowledged that Staples felt that Howard Brown was "re-trading the transaction" for a second time, to the tune of $7 million. He also acknowledged that the 2015-2017 Managers were not going to approve the Staples acquisition over the disputed $7 million.

101. In a November 15, 2017 letter to investors, BIC revealed that, for a second time, negotiations with Staples had come to an end. Citing the best interests of its equity holders, BIC rejected the deal purportedly because investors would have received a *de minimis* return on their capital contributions. Specifically, Howard Brown estimated that equity investors would have received 12 cents per dollar invested - an aggregate diminution in value of 88%.

102. However, that deal would have resulted in materially better outcomes for the Common Members than the deal that ultimately closed in June 2018. Under the April 2017 deal, all of the debt would have been paid, no extraordinary tax consequences incurred, and the Common

Members, including the Plaintiffs, would have received a return of a non-trivial part of their initial investment.

### G. **BIC Insiders Turn to Fraud to Improve Their Outcomes from the Staples Acquisition**

103. Running out of alternatives to secure substantial benefits for themselves through a transaction with a counterparty, the BIC Insiders hatched a plan to wrest those benefits from the Common Members, including the Plaintiffs. Knowing that the Staples acquisition was the only viable exit strategy for the company, and that they could not materially improve the terms upon which Staples would be willing to buy BIC's operating subsidiaries, the BIC Insiders devised a plan to generate additional benefits for themselves, while at the same time diverting substantially all of the net proceeds from the acquisition to themselves.

104. Between December 2017 and June 2018, the BIC Insiders carried out a series of transactions (the "Restructuring") that permitted BIC Insiders to redistribute the income flows from the Staples acquisition so as to avoid the payment of any but a *de minimis* amount of net sales proceeds to the Common Members. The Restructuring also generated substantial taxable gains that would be passed along to the Common Members, and which created equally substantial tax-deductible losses benefitting BIC Insider ArrowMark.

105. It is worth noting that around this time, the BIC Insiders, or at least some of them, were suffering personal financial woes that may have motivated their misconduct. On March 5, 2018, Michael Brown filed for personal bankruptcy protection.

106. The BIC Insiders carried out this scheme in six steps, each of which is outlined below and discussed further herein.

107. First, they amended the BIC operating agreement to eliminate any check on their ability to structure transactions in their own favor.

108. Second, they brought in tax accountants, KPMG, willing to endorse the positions necessary to make the tax aspects of the scheme work. They further identified BIC Insiders ArrowMark and HiTouch Nashville as BIC's Tax Representatives, with the sole authority to make decisions about BIC's taxes.

109. Third, with the help of KPMG, they revised the tax accounting of a 2012 transaction to transfer capital gains (and associated tax liabilities) to the Common Members.

110. Fourth, again with the assistance of KPMG, BIC Insiders concocted phony cancellation of debt transactions that generated tax-deductible losses for BIC Insider ArrowMark, while at the same time not materially affecting ArrowMark's ability to profit from the Staples acquisition.

111. Fifth, they issued securities to ArrowMark, while at the same time omitting material information (about the Staples acquisition that would close in June 2018, which was known to the BIC Insiders but not the Common Members) and otherwise discouraging the Common Members from exercising their preemptive rights to the same class of securities to, in significant part, make up for the "losses" that ArrowMark sustained as a result of the phony cancellation of debt transactions.

112. Sixth, and finally, they used fictitious non-compete payments and other strategies to divert proceeds from the Staples acquisition to themselves, including ArrowMark, again with the purpose of, in part, making up to ArrowMark its "losses" from cancelling debt.

### H. <u>BIC Insiders and 2015-2017 Managers Amend the Operating Agreement to Shut Out the Common Members</u>

113. The BIC Board of Managers, including the ArrowMark Preferred Member, amended the Third BIC A&R as of December 25, 2017 ("Amendment 1") (attached hereto as Exhibit 2).

114. Amendment 1 granted the BIC Board of Managers the authority to enter certain "Exempt Affiliated Transactions" without the approval of any member. Pertinently, the "entry into and performance of obligations under the Term Loan Agreement and any other documents or agreements entered into in connection therewith, **including any modification and recapitalization of any obligations thereunder (including any conversion of any obligations thereunder to Equity Securities)**" constituted an Exempt Affiliated Transaction. As a result of this change, the Common Members were stripped of ability to protect themselves from self-dealing by the BIC Insiders.

115. Amendment 1 also altered the notification period with respect to the Common Members' preemptive rights, permitting the BIC Board of Managers to delay notifying Common Members of an equity issuance for up to 90 days.

116. As a result, Amendment 1 allowed the BIC Board of Managers to effectuate the Restructuring without the knowledge or approval the Common Members.

### I. <u>ArrowMark and HiTouch Nashville Take Power as Tax Representative and Replace BIC's Outside Accountants</u>

117. ArrowMark and HiTouch Nashville acted on their powers as BIC's Tax Representatives, an office they had assumed with the adoption of the Fourth Amended and Restated BIC Operating Agreement in January 2018 ("Fourth A&R") (Exhibit 5), and which continued in the Fifth BIC A&R of April 2018 (Exhibit 1).

118. No later than 2017, ArrowMark and HiTouch Nashville caused BIC to hire KPMG as outside accountants.

119. Sometime in 2018, likely in January, KPMG displaced Anchin Block & Anchin, LLP, BIC's previous outside accountants. KPMG then made significant changes to BIC's historic accounting and tax reporting practice for the 2017 tax year.

120. First, it adjusted the Common Members' capital accounts for a 2012 stock distribution never booked by BIC's prior accounting firm.

121. Second, KPMG also moved approximately $28 million in debt from the MyOp Inc. level to BIC.

122. Third, KPMG changed BIC's tax reporting from GAAP basis to Section 704(b) basis.

### J. <u>The BIC Insiders Restructure BIC, Attributing Phony Cancellation of Debt Income to the Common Members</u>

123. Having "locked out" the Common Members and acquired new accountants for BIC, the BIC Insiders proceeded with the scheme to defraud the Common Members and squeeze all the possible value (for themselves) from the Staples acquisition. They did so by effectuating the Restructuring as reflected in the Fourth A&R.

124. First, BIC cancelled all issued and outstanding preferred units and common units sold to ArrowMark pursuant to the Preferred Equity Issuance.

125. Second, ArrowMark's $22,500,000 Term Loan (plus interest) was converted into a new tranche of term loan in the aggregate amount of $7,869,727.27 at a 5.85% interest rate. The parties also deemed satisfied all of the accrued and unpaid interest thereon. This resulted in a cancellation of debt of approximately $14 million. While, in the ordinary course, a cancellation of

debt transaction between counterparties transacting at arm's length redounds primarily to the benefit of the former debtor, that was not the case in this sham transaction. This cancellation of debt did not materially affect ArrowMark's ability to obtain proceeds from the Staples acquisition (which was the only reasonably likely source of funds to repay this debt), as described below, and instead resulted only in benefits to it, in the form of ordinary losses that it could use to avoid millions of dollars in income tax.

126. Of course, these benefits had to be balanced, from a tax perspective, by corresponding taxable gains, which were distributed to the Common Members, including the Plaintiffs, resulting in millions-of-dollars in tax liabilities for them. This was obviously foreseen by ArrowMark and the BIC Insiders, as section 5.2 (c) of the Fourth A&R was explicitly amended to provide that "no portion of cancellation of indebtedness income…arising from the restructuring…shall be allocated to ArrowMark or its Affiliates." (Exhibit 5, p. 3378).

127. In sum, this "cancellation of debt" transaction had no material impact on ArrowMark's ability to obtain funds from the Staples acquisition (either directly or indirectly through its affiliates), had no impact on BIC's finances or operations, and was carried out **solely** to create a substantial tax benefit for ArrowMark (and corresponding liabilities for the Common Members, including the Plaintiffs).

128. Third, a $4.3 million bridge loan from ArrrowMark (the "AM Bridge") (which, by January 31, 2018 totaled approximately $4.6 million, including interest), was converted to a standalone term loan with an interest rate of 5.85%. Accordingly, following the Restructuring, the outstanding balance of loans made by ArrowMark totaled approximately $12.5 million.

129. Fourth, a second $4.3 million loan (the "HT Bridge Loan") was converted into Class B preferred units.

130. Fifth, ArrowMark released Howard Brown from his personal guarantee of BIC's obligations under the Term Loan Agreement.

131. Sixth, BIC converted each common unit issued to ArrowMark pursuant to the Equity Kicker to .04 Common Units.

132. Finally, BIC sold a total of 54,720.6 Class A Preferred Units to ArrowMark, Hownan Investment Co. (Michael and Howard Brown's investment vehicle), and certain other members of BIC for the aggregate purchase price of $9 million ($164.47 per Unit).

133. Other defendants also participated in what turned out to be a very profitable short-term investment in these Class Preferred Units.

134. Steven M. Goldman, a lawyer at Kramer Levin, counsel for BIC, bought $650,000.00 worth of Class A Preferred Units.

135. Randi Sidgmore purchased $250,000.00 worth of Class A Preferred Units.

136. John Frisk bought $100,000.00 worth of Class A Preferred Units, as did Ilan Kaufthal of Eastwind Advisors.

137. Andrew Kohn bought $50,000.00 worth of Class A Preferred Units.

### K. BIC Insider Howard Brown Omits the Material Fact of the Imminent Staples Acquisition from the Offering Materials Sent to the Common Members and Discourages them from Exercising Their Preemptive Rights

138. Approximately 90 days later, on April 23, 2018, BIC circulated a Preemptive Offer Letter (attached as Exhibit 3) and a Private Placement Memorandum to its Common Members (attached as Exhibit 4) in connection with the Restructuring (the "April 2018 Preferred Equity Offering").

139. Howard Brown simply omitted to inform the Common Members of the imminence of the Staples acquisition that would close two months after this equity offering, a fact that would have been material to any Common Member considering whether to exercise their preemptive rights. Moreover, the private placement memorandum contained language that was materially misleading in light of this omission, specifically under the heading "Potential Transactions":

> From time to time, the Company [BIC] receives inquiries from third parties regarding potential transactions, including, for example, acquisitions of or business combinations with the Company and/or its subsidiaries. The Company considers such inquiries as they are proposed in order to determine whether any such potential transaction would be in the best interests of the Company and its members. Such consideration may sometimes include meetings and/or other discussions with management of third parties. There can be no assurance that any such inquiries or discussions will result in any potential transactions actually occurring.

140. Based on these representations, a reasonable investor would have expected an imminent transaction with Staples to have been disclosed. But it was not.

141. Upon information and belief, Howard Brown and the BIC Insiders knew that the Staples Transaction would go forward on the terms it ultimately did go forward on during the period between November 2017 and June 2018.

142. The source of this information and belief is as follows:

143. First, the simple fact the Staples acquisition went forward in June 2018 on substantially the same terms that were offered in November 2017, albeit at a $78.5 million purchase price instead of $76.5 million, is a strong indicator that a deal along such terms was available in this period.

144. Second, had there been any real doubt about the fact that Staples would ultimately go forward, a sophisticated investor like ArrowMark would not have put at risk the $14 million of debt that it "forgave" in January 2018. After all, being junior only to the JPM, the asset-based

lender, ArrowMark would have recovered 100% of its term loan had the November 2017 transaction gone forward or, for that matter, the June 2018 transaction. The fact that ArrowMark went forward with the Restructuring is itself compelling evidence that the Staples offer never "came off the table" between November 2017 and June 2018. Indeed, as a result of the Restructuring, ArrowMark reaped additional financial gains and was able to move significant taxable income from itself to the Common Members, while the deal terms remained substantially identical.

145. Third, that BIC was to finalize a transaction with Staples by April 2018 is further evidenced by the fact that BIC engaged East Wind Advisors on or about May 7, 2018 (at **maximum**, just **one week** after the window closed for Common Members to exercise their preemptive rights) for the purpose of negotiating a sale to Staples and its parent, Sycamore Partners.

146. Fourth, in January 2018, the BIC Insiders amended the Fourth A&R to include Section 5.3(e) (which was carried over into the Fifth A&R without change), which would make little sense in the absence of continued sale negotiations with Staples. Section 5.3(e) required that, prior to any distributions, ArrowMark receive a substantial lump sum payment should BIC be sold within the first year of January 31, 2018—the date of the Fourth A&R. Specifically, Section 5.3(e) of the Fifth A&R (which mirrors the same provision in the Fourth A&R), reads:

> [I]n the event that the Company is sold within the first year anniversary of January 31, 2018, prior to any distributions being made, ArrowMark will receive from such sale proceeds the following: (i) if the Company is sold within the first six (6) months of January 31, 2018: (1) $6 million, if sold within the first month; (2) $5 million, if sold within the second month; (3) $4 million, if sold within the third month; (4) $3 million, if sold within the fourth month; (5) $2 million if sold, within the fifth month; and (6) $1 million if sold within the sixth month; or (ii) if the Company is sold within months seven (7) through twelve (12) of January 31, 2018 for a purchase

price in excess of $75 million, ArrowMark shall receive $1.5 million of such sale proceeds.

In other words, Section 5.3(e) was merely another mechanism to shift around BIC's structure so that the BIC Insiders could reap substantially greater fruits from a deal, the economic terms of which, vis-à-vis Staples, remained substantially the same as the one outlined in the Second LOI.

147. In addition to omitting the material fact of an imminent Staples acquisition in the April 23, 2018 letter and accompanying private placement memorandum, Howard Brown also **affirmatively requested** that investors forego their preemptive rights with respect to the first $5 million of Class A Preferred Units issued and sold to ArrowMark, asserting that it had been determined by the Board of Managers that it was "appropriate for ArrowMark to invest a minimum of $5 million" in connection with the April 2018 Preferred Equity Offering.

148. As a result of the foregoing, Plaintiffs forfeited their preemptive rights, to their detriment.

### L. BIC Insiders Take Nearly All the Proceeds from Staples Acquisition for Themselves and Assign Nearly All Tax Liability to the Common Members

149. On May 31, 2018, BIC and Staples entered into a third, and, as it turned out, final, letter of intent ("Third LOI"). This letter of intent proposed an acquisition of HiTouch from BIC for a purchase price of $78.5 million in cash, with significant holdbacks.

150. The Staples acquisition closed on June 26, 2018—less than 60 days later. Staples received 100% of BIC's interest in HiTouch and, to the extent not already owned by HiTouch directly or through its subsidiary MyOP Inc., all of the equity in MyOP LLC.

151. Approximately $37.5 million from the transaction was used to pay off debt and an additional $1.5 million to pay costs related to the transaction, including $550,000 in transaction

bonuses to certain BIC Insiders and guaranteed payments to East Wind Advisors per the engagement letter dated as of May 7, 2018.

152. In addition to the transaction bonuses, BIC Insiders received substantial cash payments. Each of Howard and Michael Brown received $2 million as consideration for purported non-compete agreements. BIC Insiders received retention bonuses totaling $912,500.00. Signing bonuses to a group of employees, including Frisk, totaled $405,000.00. Finally, a group of employees including Howard Brown, Michael Brown, and Frisk were eligible to participate in a Management Incentive Program under which they would be entitled to receive 15% of the sale proceeds after repayment of the Class A and Class B Preferred Units (and before payment of proceeds to Common Members), up to $3.5 million.

153. Holders of both Class A and Class B Preferred Units received repayment in full of their investments, plus accrued interest, as required by the Fifth BIC A&R.

154. However, holders of these Class A and Class B Preferred Units also had the right to receive substantial **additional** proceeds as a result of special priority granted these Unit holders in the following way.

155. Section 5.3 of the Fifth BIC A&R provides the basis for the distribution "available cash." (Ex. 1, pp. 298-299).

156. Section 5.3(a) and 5.3(b) of the BIC Fourth A&R and of the Fifth BIC A&R (Section 5 is identical in both) provided for liquidation preferences for Class A and Class B Preferred Units respectively. These subsections give priority of payment to Class A Preferred Units, and required both classes of units to be paid out their entire Liquidation Preference, equal to the original purchase price plus the yield, less the cumulative distributions made by BIC.

157. Section 5.3(c) provides for the distribution of the remaining cash, if any, to Common Members.

158. However, Section 5.3(c) also provides that "amounts otherwise distributable to the Common Members in respect of Common Units **shall instead be distributed to the Class A Preferred Members and the Class B Preferred Members** in proportion to their relative Distribution Percentages to the extent of any amounts distributed by MyOfficeProducts, LLC to MyOfficeProducts Holdings, Inc. pursuant to the Fourth Amended and Restated Operating Agreement of MyOfficeProducts, LLC[.]" (the "MyOP Fourth A&R") (attached as Exhibit 6).

159. The MyOP Fourth A&R, in turn, provides in Section 12(a)(i) for distributions of an "amount equal to the amount distributable pursuant to Section 5.3(a) and 5.3(b) of the Brown (RI) Operating Agreement." (Ex. 6, p. 3453). The amounts distributable under those Sections of the Fifth BIC A&R, as just noted, are the **entirety** of the Class A Liquidation preference (or a minimum of $9 million) in Section 5.3(a) and the **entirety** of the Class B Liquidation preference (or a minimum of $4 million) in Section 5.3(b).

160. These provisions, if triggered, permitted the BIC Insiders to pay out effectively **at least** a 100% return on investment to the Class A and Class B Preferred Unit Holders **for a second time**, including to the BIC Insiders themselves, for what were effectively five-month (or fewer) long investments. Indeed, these provisions were drafted and used to disguise the "double premium" afforded to the BIC Preferred Unit Holders at the expense of the Common Members.

161. Upon information and belief, Section 5.3(c) of the Fifth BIC A&R was triggered following the Staples acquisition largely, if not entirely, for the purpose of compensating ArrowMark (by far the largest holder of Preferred Units) for the debt it "cancelled." The basis of this belief is the following:

162. First, the Restructuring, including the cancellation of debt, took place on exactly the same date, January 31, 2018, as the Fourth BIC A&R and the MyOP Fourth A&R became effective; all of these changes were carried out substantially as part of one transaction.

163. Second, the amount of the cancellation of debt from the Restructuring, approximately $14 million, is roughly equal to the amount of the liquidation preferences for the Class A and Class B Preferred Units, which were approximately $13.5 million.

164. Third, there does not seem to be any other purpose for Section 5.3(c) or the related provisions in the MyOP Fourth A&R. While HiTouch, MyOP LLC, and MyOP Holdings were all subsidiaries of BIC, no clear logic supports a distribution of cash to preferred unit holders of one company (BIC) triggered solely on the transfer of funds from a subsidiary company (MyOP LLC) to that subsidiary's holding company (MyOP Holdings). Nor does there appear to be any clear logic to placing this diversion of proceeds immediately before distributions to Common Members, including the Plaintiffs, in the flow of funds. Rather, the only purpose was to allow for a substantially greater recovery for BIC Class A and Class B Preferred Unit Holders based on what appears to be an unrelated, and potentially entirely arbitrary, transfer of funds between an operating subsidiary and its parent.[3] Section 5.3, in its entirety, was used to fraudulently disguise the arbitrary "double premium" granted to Preferred Unit Holders at the expense of the Common Members.

165. Fourth, given that the Restructuring was carried out in order to wring the greatest possible benefits for the BIC Insiders at a time when an acquisition by Staples remained "on the table" upon terms that, at least between BIC and its subsidiaries on one hand and Staples on the other, did not materially change, this provision in Section 5.3(c) of the Fourth BIC A&R (and

[3] It should be noted that the operative language of the MyOP Fourth A&R, as well as the agreement as a whole, reflects hasty drafting. The MyOP Fourth A&R has, for example, two sections each numbered as 10, 11, and 12.

which was carried over intact to the Fifth BIC A&R) provided a mechanism by which the debt ArrowMark "cancelled" could be made up.

166. In sum, ArrowMark did not truly cancel $14 million in debt. Upon information and belief, by virtue of the "double dipping" provision in Section 5.3(c), ArrowMark was able to recoup that entire sum, with the added benefit of shifting **all** of the negative tax consequences to the Common Members, including Plaintiffs.

167. Finally, upon information belief, the BIC Insiders diverted another $2 million to ArrowMark pursuant to Section 5.3(e) of the Fourth and Fifth A&Rs simply because the Staples acquisition closed within five months of January 31, 2018. Like Section 5.3(c), Section 5.3(e) does not appear to have any logical economic purpose except to siphon additional funds to BIC Insider ArrowMark and away from the Common Members. As a result of this provision, ArrowMark received an additional $2 million from the net sale proceeds.

### M. BIC Common Members, Including the Plaintiffs, Receive Almost No Net Proceeds, but Substantial Tax Liability, After the Staples Acquisition

168. In stark contrast to the substantial and tangible benefits lavished upon the BIC Insiders and certain former Managers in connection with the Staples acquisition, the Common Members received payments for their interest amounting to less than 1% of their initial investments. In addition, the vast majority of those already-minimal payments were held back pursuant to the agreement to ensure that BIC and its affiliates lived up to its non-compete and other obligations.

169. Making the deal even worse for the Common Members, all of the Common Members were allocated substantial amounts of ordinary income and capital gains as a result of

the Staples acquisition, amounts which grossly exceeded the amounts of their respective cash-dollar proceeds from the sale.

170. By way of example, one Common Member, Plaintiff Joseph Aiello, who had invested more than $1.5 million in BIC, received a cash distribution of $3,040.00 as a result of the Staples acquisition. However, he was also assigned ordinary income (from cancellation of debt) in the amount of $777,341.00 from BIC and capital gains in the amount of $945,791.00 from MyOP Holdings in K-1s that were issued in the last two weeks of September 2019. Accordingly, on a net basis, and because of the defendants' wrongful acts, this Common Member not only lost substantially all of his $1.5 million investment in BIC and, through BIC, in MyOP Holdings, but he was further required to pay hundreds-of-thousands of dollars in taxes to federal and state tax authorities as a result. These allocations to Plaintiff Aiello were substantially greater than the historic basis of pass-through loss and evidenced an intent to avoid the tax burden falling on BIC Insiders and to shift it to the Common Members. The same is true as to the tax allocations made to the other Plaintiffs in proportion to their interest in the common units.

171. On the basis of the K-1s that were issued to the Plaintiffs, and upon which they relied in filing their federal, state. and local tax returns, the Common Members, as a whole, were made liable for millions-of-dollars in both taxable ordinary income and taxable capital gains.

## CAUSES OF ACTION

### First Cause of Action (Against the BIC Insiders)

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5(b)

172. Paragraphs 1 through 171 above are repeated and realleged and incorporated herein.

173. As described above, the BIC Insiders caused BIC to issue the Class A Preferred Units in January 2018 and Howard Brown, on behalf of the BIC Insiders, informed the Common

Members, including Plaintiffs, of their preemptive rights in connection with that issuance in April 2018. Each of the Plaintiffs had the right to participate in this securities offering.

174. Howard Brown and the BIC Insiders, however, failed to inform the Common Members either that negotiations with Staples had resumed no later than January 2018 or that the Staples acquisition was going to proceed in June 2018, material facts as to which they had knowledge, upon information and belief, as described above.

175. Because the letter to shareholders and the 2018 offering materials constitute "group published" documents, Howard Brown's material omissions can likewise be attributed to the other BIC Insiders, who, as fully outlined above, had direct involvement in the everyday affairs of the company.

176. Moreover, the BIC Insiders knew that this fact would have been material to the decision of the Common Members, including Plaintiffs, regarding whether to exercise their preemptive rights in connection with that offering in the **less than five business days** that they were given to make the decision. Simply put, because of the liquidation preferences that the Class A Preferred Units enjoyed, an acquisition by Staples at the amount offered either in November 2017 or June 2018 would have guaranteed, at a minimum, a riskless return of investment, a potential double payout by virtue of the "double dipping" mechanism in Section 5.3(c), and the defined yield for any person who exercised their preemptive rights.

177. Howard Brown was not only the maker of the statements containing the material omission but also, as Chairman of the Board of BIC, the person with ultimate authority to speak on behalf of BIC concerning such matters.

178. Howard Brown also had motive to derail the Staples acquisitions in 2016 and November 2017—namely, to place himself and Michael Brown in better financial positions. His

participation in the Restructuring caused Common Members to receive a nominal return as a result of the Staples acquisition, while he personally walked away with millions. This is evidence of his intent to manipulate and defraud the Common Members.

179. The remainder of the BIC Insiders also had motive and opportunity to derail the November 2017 negotiations in favor of the June 2018 acquisition and omit the material fact of the imminent Staples acquisition. This afforded them the opportunity to effectuate the Restructuring to generate significantly better returns for themselves upon deal terms that did not materially change from the Second LOI to the Third LOI. They did so to the demonstrated detriment of the BIC Insiders.

180. First, ArrowMark, HiTouch Nashville, and all of the BIC Insiders acquired Preferred Shares in connection with the Restructuring. ArrowMark purchased $5 million in Class A Preferred Units; Howard Brown and Michael Brown (through Hownan Investment Co.) purchased $2.6 million in Class A Preferred Units; Steven Goldman purchased $650,000.00 worth of Class A Preferred Units; and John Frisk purchased $100,00.00 in Class A Preferred Units. Notably, John Frisk did not hold equity in BIC until January 31, 2018—the date the Restructuring was effectuated.

181. In addition, by converting the HT Bridge Loan into Class B Preferred Units, Howard Brown and Michael Brown acquired million-of-dollars in additional preferred equity.

182. Because each BIC insider held substantial Preferred Units, each benefitted from the newly adopted liquidation preferences and fraudulent "double dip" mechanism in Section 5.3(c) of the Fourth and Fifth A&Rs, which allowed them to recoup their preferred investments twice over.

183. Further, Howard Brown, Michael Brown, and John Frisk benefitted from the Restructuring by receiving additional non-compete payouts, transactions bonuses, and/or payouts associated with the Management Incentive Program passed during the Restructuring. Steven Goldman further benefitted from the Restructuring when his firm, Kramer Levin, received $325,000.00 in net sales proceeds from the acquisition.

184. In addition, by cancelling its ownership of Common Units, cancelling $14 million in debt, and adopting Section 5.2(c) of the Fourth A&R (which explicitly prevented any allocation of cancellation of debt income to ArrowMark), ArrowMark was able to recoup its entire Term Loan (and, upon information and belief, substantial additional proceeds) while simultaneously avoiding any negative tax consequences from the Staples acquisition. ArrowMark also avoided any negative tax consequences when, as Tax Matters Representative, it moved $28 million in debt from the MyOp Inc. level to the BIC level, which shifted any liability for capital gains taxes away from it.

185. ArrowMark also benefitted from adopting Section 5.3(e) in the Fourth A&R (which carried over into the Fifth A&R). By virtue of that section, ArrowMark was entitled to receive an additional $2 million in net sales proceeds, simply because the Staples acquisition occurred within five months of January 31, 2018. This sum was paid out prior to any other distributions.

186. ArrowMark had the opportunity to prevent the January 2018 Restructuring and the June 2018 acquisition from going forward. Without ArrowMark's consent, BIC could not proceed with the Restructuring transactions or a sale of its operating subsidiaries.

187. Likewise, Howard Brown had the opportunity to prevent the January 2018 Restructuring and the June 2018 acquisition from going forward by virtue of his authority as Chairman of BIC and the "face of the franchise." Had he withheld his participation and consent,

neither the Restructuring nor the June 2018 acquisition could have gone forward, as he could have simply refused to execute the documents that effectuated those transactions.

188. Pursuant to Section 13.2 of the Fourth and Fifth A&Rs, each of Michael Brown, Howard Brown, and John Frisk, as "Brown Managers," had the opportunity to prevent the sham cancellation of debt and inequitable allocation of the associated tax consequences to the Common Members—pivotal components of the Restructuring. The written consent of at least one of the three Brown Managers was required to effectuate those transactions.

189. John Frisk had the added opportunity to derail the Restructuring and Staples acquisition because he was one of the only employees that Staples wanted to retain. Because Staples would not acquire BIC's operating subsidiaries without Frisk, he had the ability to prevent the deal with Staples.

190. Goldman also had the opportunity to prevent the Restructuring and June 2018 acquisition by virtue of his roles as BIC's longtime outside counsel and personal friend of Howard Brown.

191. Finally, each of the BIC Insiders had the ability to disclose the imminence of a transaction with Staples to the Common Members. As fully outlined herein, each BIC Insider knew that a deal with Staples was still on the table, and they specifically undertook the Restructuring to create additional benefits for themselves in anticipation thereof. Equipped with this knowledge, any one of them could have disclosed to the Common Members that an acquisition by Staples was on the horizon.

192. The Common Members, including Plaintiffs, reasonably relied on the statements made to them by the BIC Insiders in April 2018 in deciding to forfeit their preemptive rights, reasonably believing both that there was no prospect of an imminent acquisition by Staples and

that it was in the best interests of BIC (and, correspondingly, in their best interests as equity holders of BIC) that they forfeit their preemptive rights. Of course, as it turned out, both of those beliefs were false.

193. The Plaintiffs forfeited their preemptive rights on the basis of the omission of the material fact of the imminent Staples acquisition, a fact as to which the BIC Insiders had actual knowledge (as fully outlined above), as well as the representation regarding the best interests of BIC. They lost money and incurred substantial tax liability as a result.

194. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

195. As evidenced above, the BIC Insiders omitted the material fact relating to the impending Staples acquisition in June 2018 in the April 2018 letter and corresponding offering materials to Common Members, wherein they actually asked the Common Members **not** to invoke their preemptive rights. By following the BIC Insiders' request and forfeiting their preemptive rights, the Common Members lost nearly the entirety of their investments and were saddled with the majority of the tax consequences, while the BIC Insiders, amongst others, received substantial proceeds and tax benefits. This omission, viewed in conjunction with the BIC Insiders' demonstrated participation in the Restructuring of BIC and its subsidiaries, is evidence of a "manipulative or deceptive device or contrivance" in relation to a securities transaction, and thus a violation of Section 10(b).

196. Liability under Rule 10b-5(b) requires a showing of: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance by the plaintiffs; (5) economic loss; and (6) loss causation. The BIC Insiders made a

material omission to Common Members in their April 2018 letter relating to the Staples acquisition. They acted with scienter, proven by their motive and opportunity to commit fraud in making such an omission, as they each benefitted financially from Common Members forfeiting their preemptive rights, which exercise would have diminished the BIC Insiders', and others', ability to profit from the scheme. The Plaintiffs relied on this material omission and as a direct result suffered economic losses, in the form of heavy tax consequences, while also losing almost all of their investments.

Second Cause of Action (Against the BIC Insiders)

Federal Securities Fraud In Violation of Section 10(b) of the '34 Act and Rule 10b5 (a,c)

197. Paragraphs 1 through 196 above are repeated and realleged and incorporated herein.

198. As described above, the BIC Insiders, each of whom was a 2015-2017 Manager, authorized Amendment 1 to the Third A&R, which deprived the Common Members of their right to effectively exercise their preemptive rights and which allowed the Board of Managers to effectuate certain key components of the Restructuring without the knowledge or consent of the Common Members.

199. The BIC Insiders then caused BIC to issue Class A Preferred Units in January 2018 and informed the Common Members, including Plaintiffs, of their preemptive rights in connection with that issuance in April 2018—nearly three months later. Each of the Plaintiffs had the right to participate in this securities offering, but were afforded only five business days to do so.

200. Each of the BIC Insiders undertook the Restructuring in anticipation of the Staples acquisition. Upon information and belief, John Frisk knew about the imminence of an acquisition by Staples, as he acted as the primary contact for the Staples M&A team, and he was President and CEO of HiTouch at all relevant times. Howard Brown and Michael Brown also communicated

with the Staples M&A team and, by virtue of their control positions on BIC's Board of Managers, they knew that negotiations continued between November 2017 and June of 2018. Likewise, Goldman was intimately involved in BIC's everyday affairs, including its legal affairs, and he would have had knowledge of any acquisition negotiations as the primary partner at Kramer Levin responsible for BIC's legal matters. Finally, upon information and belief, ArrowMark was aware of the continued negotiations with Staples and the immanency of an acquisition because its consent would have been required for any such transaction to proceed, and it represented a majority of the Board of Managers throughout 2018.

201. Moreover, the inclusion of Section 5.3(e) in the Fourth and Fifth A&Rs illustrates that the BIC Insiders **specifically contemplated** an imminent sale of BIC's operating subsidiaries. This subsection provides for the payment of additional premiums to ArrowMark in the event that the company was sold within twelve months of January 31, 2018. Moreover, the amount of these premiums changed materially by the *month* in which such a sale occurred. ArrowMark was to receive an additional $6 million if the company sold within the first month after January 31, 2018; $5 million if the company sold within the second month; $4 million if the company sold within the third month; $3 million if the company sold within the fourth month; $2 million if the company sold within the fifth month (when the company was, in fact, sold); and $1 million if the company sold within the sixth month. (Ex. 1 at 299); (Ex. 5 at 3379). Such a provision would have been pointless if an acquisition were not anticipated to close imminently.

202. In addition, all of the BIC Insiders made substantial purchases of Class A Preferred Units in connection with the Restructuring and in anticipation of the Staples acquisition, further illustrating that they knew negotiations with Staples never truly came off the table in November 2017.

203. The issuance of the Class A Preferred Units, as well as the issuance of the Class B Preferred Units, around the same time as part of the Restructuring were critical elements of the BIC Insiders' "scheme [or] artifice to defraud" the Commons Members.

204. By simultaneously cancelling debt owed by BIC or its subsidiaries to ArrowMark and issuing preferred securities to ArrowMark in place of that debt, the BIC Insiders generated substantial ordinary losses for ArrowMark while, at the same time, affecting in no material way ArrowMark's ability to obtain proceeds from the Staples acquisition. In other words, ArrowMark reaped the additional benefit of incurring beneficial ordinary losses for tax purposes, even though it was able to recoup the full value of its "canceled" debt as a result of its liquidation preference and the "double dipping" mechanism in Section 5.3 of the Fourth and Fifth A&Rs.[4]

205. Each of the BIC Insiders (except John Frisk) knew of and approved of each of the transactions that were part of the January 2018 Restructuring, as reflected in January 26, 2018 joint board minutes of among other entities, BIC. John Frisk knew of and approved of each of the transactions that were part of the January 2018 Restructuring as evidenced by his signature on the Limited Waiver and Fifth Amendment to Credit Agreement that effectuated the Restructuring.

206. Because the Term Loan issued by ArrowMark as well as the Class A and Class B Preferred Units were superior in liquidation preference to the interests of the Common Members, moving ArrowMark's interests from one level to another had no effect on the security of that initial investment. While both the Term Loan and the Class A and Class B Preferred Units were

[4] Upon information and belief, ArrowMark also received another $2 million in net proceeds pursuant to Section 5.3(e), for the sole reason that the Staples acquisition occurred within five months of January 31, 2018. As with Section 5.3(c), there was no discernable purpose for this provision except to siphon additional funds to ArrowMark and away from the Common Members in anticipation of the Staples acquisition.

subordinate to the fully-secured loan from JPM, the asset-backed lender, all these interests were superior to those held by BIC's Common Members, including the Plaintiffs.[5]

207. Moreover, ArrowMark controlled BIC's management after the Restructuring occurred, meaning it could prevent any occurrence that would jeopardize its position in the "flow of funds" from the Staples acquisition, such as the incurrence of new debt that would be superior in priority to the position of its Class A and Class B Preferred Units. As it turned out, no new debt was incurred by BIC or its subsidiaries between the January 2018 Restructuring and the consummation of the Staples acquisition five months later.

208. As a result of the foregoing, ArrowMark, through the actions of the BIC Insiders, was able to obtain a minimum of $14 million in ordinary losses that it could use to offset taxable gains. However, in order to obtain these losses, an offsetting amount of taxable ordinary income had to be generated from the cancellation of debt.

209. In order to benefit and enrich themselves at the Common Members' expense, the BIC Insiders decided that the cancellation of debt income should be attributed the Common Members in proportion to their ownership of Common Units.

210. Moreover, notwithstanding BIC's at least potential insolvency, because this cancellation of debt occurred at the "BIC level" and because BIC is a limited liability company, this cancellation of debt income could **only** be excluded from a Common Member's gross income only if the Common Member was himself insolvent.

211. The BIC Insiders had both the motive and opportunity to effectuate the foregoing fraudulent scheme. Through the Restructuring, Howard Brown endeavored to place himself and

[5] In other words, it made no difference whether ArrowMark got paid out as a BIC lender or a holder of Preferred Units. The difference was that the cancellation of debt resulted in catastrophic tax consequences for the Common Members.

Michael Brown in better financial positions. His participation in the Restructuring caused Common Members to receive a nominal return as a result of the Staples acquisition, while he personally walked away with millions. This is evidence of his intent to manipulate and defraud the Common Members.

212. The remainder of the BIC Insiders also had motive and opportunity undertake the fraudulent scheme in 2017 and 2018, as it allowed them to generate significantly better returns for themselves upon deal terms that did not materially change from the Second LOI to the Third LOI. They did so to the demonstrated detriment of the BIC Insiders.

213. First, ArrowMark, HiTouch Nashville, and all of the BIC Insiders acquired Preferred Shares in connection with the Restructuring. ArrowMark purchased $5 million in Class A Preferred Units; Howard Brown and Michael Brown (through Hownan Investment Co.) purchased $2.6 million in Class A Preferred Units; Steven Goldman purchased $650,000.00 worth of Class A Preferred Units; and John Frisk purchased $100,00.00 in Class A Preferred Units. Notably, John Frisk did not hold equity in BIC until January 31, 2018—the date the Restructuring went into effect.

214. In addition, by converting the HT Bridge Loan into Class B Preferred Units, Howard Brown and Michael Brown acquired million-of-dollars in additional preferred equity.

215. Because each BIC insider held substantial Preferred Units, each one benefitted from the newly adopted liquidation preferences and fraudulent "double dip" mechanism in Section 5.3(c) of the Fourth and Fifth A&Rs, which allowed them to recoup their preferred investments twice over.

216. Further, Howard Brown, Michael Brown, and John Frisk benefitted from the Restructuring by receiving additional non-compete payouts, transactions bonuses, and/or payouts

associated with the Management Incentive Program passed during the Restructuring. Steven Goldman further benefitted from the Restructuring when his firm, Kramer Levin, received $325,000.00 in net sales proceeds from the acquisition.

217. In addition, by cancelling its ownership of Common Units, cancelling $14 million in debt, and adopting Section 5.2(c) of the Fourth A&R (which explicitly prevented any allocation of cancellation of debt income to ArrowMark), ArrowMark was able to recoup its entire Term Loan (and, upon information and belief, substantial additional proceeds) while simultaneously avoiding any negative tax consequences from the Staples acquisition. ArrowMark also avoided any negative tax consequences when, as Tax Matters Representative, it moved $28 million in debt from the MyOp Inc. level to the BIC level.

218. ArrowMark also benefitted from adopting Section 5.3(e) in the Fourth A&R (which carried over into the Fifth A&R). By virtue of that section, ArrowMark was entitled to receive an additional $2 million in net sales proceeds, simply because the Staples acquisition occurred within five months of January 31, 2018. This sum was paid out prior to any other distributions.

219. ArrowMark had the opportunity to undertake the fraudulent scheme by virtue of its control position on the BIC Board of Managers. Without ArrowMark's consent, BIC could not proceed with a sale of its operating subsidiaries nor could it effectuate the tax-related actions taken during the Restructuring.

220. Likewise, Howard Brown had the opportunity to undertake the fraudulent scheme by virtue of his authority as Chairman of BIC and the "face of the franchise." Without his knowing participation and consent, the scheme could not have gone forward, as he could have simply refused to execute the documents that effected the Restructuring and the Staples acquisition.

221. Howard Brown, Michael Brown and John Frisk were in 2018 BIC Managers with formal authority to direct actions on behalf of BIC, which they used to effectuate the Restructuring and the Staples acquisition.

222. Moreover, pursuant to Section 13.2 of the Fourth and Fifth A&Rs, each of Michael Brown, Howard Brown, and John Frisk, as "Brown Managers," had the opportunity to carry out the sham cancellation of debt and allocate the inequitable tax consequences to the Common Members—pivotal components of the Restructuring. Under this section, the written consent of at least one of the three Brown Managers was required to effectuate those transactions.

223. John Frisk had the added opportunity undertake the scheme to defraud because he was one of the only employees that Staples actually wanted to retain. Accordingly, he had substantial power to demand a reorganization of BIC that would inure to his further benefit.

224. Goldman had the opportunity proceed with the fraudulent scheme and arrange a more favorable deal for himself by virtue of his roles as BIC's longtime outside counsel and personal friend of Howard Brown. Without his involvement, the scheme could not have gone forward because he had the ability, based on his long involvement with BIC and personal relationships with BIC Common Members, to prevent the scheme from going forward.

225. Finally, each of the BIC Insiders had the ability to disclose the imminence of a transaction with Staples to the Common Members. As fully outlined herein, each BIC Insider knew that a deal with Staples was still on the table, and they specifically undertook the Restructuring to create additional benefits for themselves in anticipation thereof. Equipped with this knowledge, any one of them could have disclosed to the Common Members that an acquisition by Staples was on the horizon.

226. The Common Members, including Plaintiffs, reasonably relied on the statements made to them by the BIC Insiders in April 2018 in deciding to forfeit their preemptive rights, reasonably believing both that there was no prospect of an imminent acquisition by Staples and that it was in the best interests of BIC (and, correspondingly, in their best interests as equity holders of BIC) that they forfeit their preemptive rights. Of course, as it turned out, both of those beliefs were false.

227. The Plaintiffs forfeited their preemptive rights on the basis of the omission of the material fact of the imminent Staples acquisition, a fact as to which the BIC Insiders had actual knowledge (as fully outlined above), and the representation regarding the best interests of BIC. They lost money and incurred substantial tax liability as a result.

228. The Common Members suffered substantial injury as a result of this scheme to defraud.

229. First, as noted above, following the Staples acquisition, the BIC Insiders diverted substantially all of the net proceeds to themselves through direct cash payments, special guaranteed payments, and through use of the liquidation preferences in the Class A and Class B Preferred Units described above, including the Section 5.3(c) “double dipping” mechanism, which diverted funds otherwise due the Common Members.

230. Second, by generating paper losses through cancellation of debt income for ArrowMark, the BIC Insiders generated corresponding ordinary income gains for Common Members, resulting in millions-of-dollars in tax liabilities for them.

231. Third, as described above, the Common Members, including Plaintiffs, suffered injury in their reliance on the statements of the BIC Insiders, as described above. Those statements were materially misleading as a result of their omission of the material fact of an imminent Staples

acquisition, and they forfeited their preemptive rights and suffered dilution of their interest in BIC on the basis of that omission. The Class A Preferred Units that were issued in January 2018 and were subject to the exercise of preemptive rights in April 2018 and had liquidation preference rights over other securities issued by BIC, including the Common Units held by the Common Members. As a result, the "Class A" Preferred Units paid out, not only the full amount of the purchase price, but also a substantial return on investment.

232. Each of the Common Members, including Plaintiffs, suffered damages as a result of their forfeiture of their preemptive rights occasioned by the scheme to defraud identified above, as well as from the substantial federal and state tax burden imposed on them as a result of this scheme and/or artifice.

233. As previously stated, Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

234. The above sequence of events indicates a "manipulative or deceptive device or contrivance" in relation to at least two securities transactions, resulting in Common Members being defrauded of their investments while BIC Insiders walked away with almost the entirety of the net proceeds from the acquisition, having shifted substantial tax consequences to Plaintiffs.

235. Rule 10b5 (a) and (c) makes it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit…in connection with the purchase or sale of any security." Such claims require that defendants (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.

236. As described, *supra*, the issuance of Class A and Class B Preferred Units around the same time as part of the Restructuring were critical to the BIC Insiders' "scheme [or] artifice to defraud" the Commons Members, and were key transactions that permitted BIC Insiders to redistribute the income flows and tax obligations from the Staples acquisition to their benefit (and to the detriment of the Common Members, including the Plaintiffs). By engaging in a sham cancellation of debt transaction that lacked "substantial economic effect" for the purposes of creating tax-deductible losses, and then engaging in securities transactions for the purpose, at least in part, of eliminating that loss, the BIC Insiders violated Section 10(b) and Rule 10b5(a,c). As described above, because each of the BIC Insiders exercised effective control over the affairs of BIC, they had the "opportunity" to engage in such a scheme. Moreover, because each of the BIC Insiders stood to make substantial, and personal, gains as a result of the Staples acquisition, they had motive to do so. The non-ArrowMark BIC Insiders further had motive to commit to such a scheme because of their need to satisfy ArrowMark in order for the Staples Acquisition to go forward, as ArrowMark had both the legal and factual ability to prevent the transaction from going forward. The 2018 issuance of Preferred Units was a part of the scheme, as described above. Finally, the Common Members, including the Plaintiffs, were injured by the scheme because it diluted their equity interest in BIC to practically nothing while at the same time attributing to them all of the negative tax consequences associated with the Restructuring.

<u>Third Cause of Action (Against David Corkins)</u>

<u>Control Person Liability Under Section 10(b) and Section 20(a) of the '34 Act</u>

237. Paragraphs 1 through 236 above are repeated and realleged and incorporated herein.

238. Section 20(a) states in pertinent part that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action." A plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.

239. Both ArrowMark and HiTouch Nashville are among the BIC Insiders that participated in the Section 10b5(a,c) scheme and/or artifice to defraud described above.

240. David Corkins is the Managing Member of both ArrowMark and HiTouch Nashville and as such is the or a "control person" of each of those entities as that term is used in Section 20(a).

241. Corkins further "culpably participated" in the scheme and/or artifice to defraud, as reflected by his signatures on the Written Consent of the Members of BIC, authorizing the Fourth A&R, and Fourth BIC A&R itself, which sets forth the key elements the January 2018 Restructuring.

242. Those elements are reflected in the Fourth BIC A&R, and include,, without limitation:

a. BIC's cancellation of all issued and outstanding preferred units and common units sold to ArrowMark pursuant to the Preferred Equity Issuance (Fourth BIC A&R, Exhibit 5, p. 16);

b. BIC's reduction of the ArrowMark Term Loan to approximately $8 million, resulting in about $14 million in cancelled debt (Fourth BIC A&R, Exhibit 5, p. 16);

c. BIC's conversion of the $4.3 million AM Bridge (which, by January 31, 2018 totaled approximately $4.6 million, including interest) to a standalone term loan with an interest rate of 5.85%. (Fourth A&R, Exhibit 5, p. 16); and

d. BIC's issuance of approximately $9 million in Class A Preferred Units, $5 million of which ArrowMark purchased at or about that time (Fourth BIC A&R, Exhibit 5, p. 1; p. 3).

243. In addition, the Fourth A&R implemented the "double dipping" mechanism in Section 5.3(c) and the payout provision of Section 5.3(e), which provided for a seven-figure pre-distribution payment to ArrowMark based solely upon the month in which BIC's assets were sold. The Fourth A&R also appointed ArrowMark and HiTouch Nashville as BIC's Tax Representative.

244. Furthermore, given the size of the cancellation of debt (at least $14 million) by ArrowMark that was carried out as part of the January 2018 Restructuring, it is reasonable to conclude that by virtue of his familiarity with the Fourth BIC A&R, Corkins knew both how ArrowMark could recoup its losses, *viz.*, through the Section 5.3(c) and Section 5.3(e) mechanisms described above, and further how it could obtain valuable gains, *viz.*, paper losses that could be used to offset ordinary income gains from other sources, with the resulting tax burden being foisted off on the Common Members, including the Plaintiffs.

245. Accordingly, for these reasons, Corkins is liable for the wrongful acts of ArrowMark and HiTouch Nashville as a "control person" under Section 20(a).

<u>Fourth Cause of Action (against the BIC Insiders)</u>

<u>Common Law Fraud</u>

246. Paragraphs 1 through 245 above are repeated and realleged and incorporated herein.

247. By engaging in the above-referenced conduct, each of the BIC Insiders further committed fraud under common law.

248. As described above, defendant Howard Brown omitted a material fact from his April 23, 2018 communications to the Common Members, including Plaintiffs, *viz.*, that Staples was about to acquire BIC's operating subsidiaries. The material omission is attributable to the remaining BIC Insiders because they were directly involved in the everyday affairs of BIC.

249. The representations made in that communication were materially misleading as a result of that omission.

250. The BIC Insiders knew of or recklessly disregarded the significance of that acquisition to the Common Members, including Plaintiffs.

251. The BIC Insiders intended to induce the Common Members, including Plaintiffs, to rely on these misleading misrepresentations, in order to accomplish the explicitly stated goal of discouraging them from participating in the securities issuance. Each of the Plaintiffs had the right to participate in this securities offering and, in reliance upon the BIC Insiders' material omissions and affirmative request, Plaintiffs forfeited those rights, and suffered dilution of their equity interest in BIC as a result.

252. The Common Members, including Plaintiffs, justifiably relied on the misleading misrepresentations which were made in the materials embodying the securities offering.

253. The Common Members, including Plaintiffs, suffered injury as a result of their justifiable reliance, in that they forfeited their preemptive rights, which, if exercised, would have resulted in a return of 100% of the amount invested and a substantial premium.

254. Upon information and belief, the source of which is their participation in the January 26, 2018 board meeting at which the Restructuring was discussed, or in the case of John

Frisk, his signature on at least one key document of the Restructuring, each of the BIC Insiders knew and approved of these offering materials before they were sent to the Common Members, including Plaintiffs.

255. Each of the BIC Insiders took the steps necessary to authorize these materials for distribution with knowledge that the omission of the material fact of the imminent Staples acquisition was material to the Common Members, including Plaintiffs.

Fifth Cause of Action

(Against the 2018 Managers, the 2015-2017 Managers, and ArrowMark)

Breach of the Duty of Good Faith and Fair Dealing

256. Paragraphs 1 through 255 above are repeated and realleged and incorporated herein.

257. The Third, Fourth, and Fifth Amended and Restated Operating Agreements constitute contracts between and among its managers, members, and officers. The Third A&R granted the 2015-2017 Managers the authority to control significant aspects of their relationship with the Common Members, including to issue equity (Section 4.3) and amend the operating agreement (Section 10.1).

258. Likewise, the Fourth and Fifth A&Rs granted the 2018 Managers and ArrowMark (as applicable) the authority to control significant aspects of their relationship with the Common Members, including the authority to issue equity (Section 4.3), make distributions of available cash (Section 5.3), authorize a sale of BIC (or substantially all of its assets) (Section 6.3), amend or modify the BIC operating agreement (Section 10.1), and allocate taxes (Section 11.3; Section 13.2(a)). The 2018 Managers had the obligation to exercise their discretion under these provisions consistently with the implied covenant of good faith and fair dealing.

259. Each of the Common Members, including Plaintiffs, expected that, consistent with the implied covenant, the Managers and ArrowMark would exercise their obligations under the relevant operating agreements in good faith, and would refrain from actions that would arbitrarily deprive the Common Members of the benefits of their bargain—i.e. their investments. The Common Members also expected that the relevant Managers and ArrowMark would refrain from assigning them taxable phantom income without any substantial economic effect.

260. The following Managers approved the Restructuring during the January 26, 2018 Board Meeting: Howard Brown, Michael Brown, Steven Goldman, Andrew Kohn, and Michael Novoseller. Although not present that meeting, upon information and belief, Randi Sidgmore, Michael Cornell, and Jay Nadel knew of and approved the Restructuring transactions. It was Howard Brown's custom and practice to call Managers who could not attend board meetings (either immediately before or immediately after the meeting) to outline the topics for discussion and elicit their approval on matters requiring consent.

261. ArrowMark and the following Managers executed the Fourth A&R, which gave effect to the transactions associated with the Restructuring: John Frisk, Howard Brown, and Les Goodman.

262. The following 2018 Managers authorized and allowed the BIC Insiders to distribute the 2018 equity offering materials that materially omitted the immanence of an acquisition by Staples: Howard Brown, Michael Brown, John Frisk, Michael Novoseller, Sanjai Bhonsle, and Karen Reidy.

263. The following 2018 Managers approved the Staples acquisition and the Management Incentive Program at the June 25, 2018 Board Meeting: Howard Brown, Michael Brown, John Frisk, Sanjai Bhonsle, Karen Reidy, John Eisinger, and Dana Staggs.

264. By authorizing and approving the Restructuring transactions and the 2018 Staples acquisition, and by authorizing and allowing the sham cancellation of debt in order to generate millions of dollars in paper tax losses for BIC Insider ArrowMark (and foist the corresponding tax liability onto the Common Members, including Plaintiffs), ArrowMark and the relevant Managers acted in bad faith and breached the implied covenant of good faith and fair dealing. The result, in part, was the arbitrary, unreasonable, and bad faith allocation of millions-of-dollars in taxable gains to the BIC Common Members, who received almost no hard-dollar proceeds from the Staples acquisition.

265. The relevant Managers also breached the implied covenant of good faith and fair dealing by allowing the omission of material information from the April 23, 2018 materials concerning the Class A Preferred Units offering, in which each of the Plaintiffs had the right to participate. Specifically, those Managers allowed the materials to omit the fact that the Staples acquisition was imminent, which, in bad faith, made the statements contained therein materially misleading.

266. By authorizing the diversion of millions-of-dollars in net proceeds from the Staples acquisition to various insiders (including Michael and Howard Brown) for non-compete agreements (and otherwise), which had no economic basis, were unwarranted, and were made part of the transaction solely for the purpose of siphoning value from the Common Members, the relevant Managers acted in bad faith and breached the implied covenant of good faith and fair dealing.

267. For the reasons outlined in this Complaint, each of the Managers knew or should have known about: the lack of a proper basis for the January 2018 Restructuring; the omissions of material facts from the April 23, 2018 communications with investors; and the fact that proceeds

from the Staples acquisition were being diverted to insiders and Preferred Unit Holders at the expense of the Common Members.

268. The Common Members, including Plaintiffs, were damaged as a result of the January 2018 Restructuring, having incurred millions of dollars in tax liabilities as a result of actions taken by ArrowMark and the relevant Managers in disregard of their duties in order to favor BIC Insider ArrowMark by engaging in a sham cancellation of debt transaction.

269. The Common Members, including Plaintiffs, were damaged as a result of the material omissions in the April 23, 2018 offering materials, having forfeited their preemptive rights.

Sixth Cause of Action (Against Howard Brown)

Breach of the Duty of Good Faith and Fair Dealing

270. Paragraphs 1 through 269 above are repeated and realleged and incorporated herein.

271. The Third A&R (together with the amendment thereto) constitutes a contract between and among its managers, members, and officers. The Third A&R granted Howard Brown, as Chairman and Manager, to control significant aspects of his relationship with the Common Members, including the authority to approve a sale of BIC or substantially all of its assets (Section 6.3) and amend the BIC operating agreement (Section 10.1). Howard Brown had the obligation to exercise his discretion under these provisions consistently with the implied covenant of good faith and fair dealing.

272. As described above, in August 2016, Staples and BIC had entered into an agreement in principle under which Staples would acquire BIC's operating subsidiaries for $110 million.

273. In November 2016, Howard Brown prevented this agreement from going forward in bad faith in order to bargain for millions-of-dollars in additional cash consideration to be paid

by Staples to himself and his son. Indeed, he outlined his plan to negotiate $3 million in additional consideration to be paid to himself and his son at the October 31, 2016 Meeting of the BIC Board of Managers. This constituted a significant re-trade of the terms outlined in the August 30, 2016 LOI from Staples, previously executed by BIC.

274. Staples refused to make such payments, withdrew its original offer, and instead offered to purchase BIC's operating subsidiaries, for approximately $70 million. This offer was rejected by BIC and negotiations terminated.

275. Howard Brown engaged in self-dealing despite BIC's dire financial situation—it could neither pay its operational costs nor its plethora of lenders.

276. A second round of negotiations with Staples resulted in the Second LOI, under which Staples would have purchased BIC's operating subsidiaries for $76.5 million. Howard Brown again prevented BIC from going forward with this deal, for the stated reason that the equity investors would not obtain a sufficient return. However, the real reason was the Howard Brown wanted to divert more of the proceeds to himself and other BIC Insiders, again, notwithstanding BIC's dire financial circumstances.

277. By engaging in these actions, Howard Brown violated his obligations of good faith and fair dealing to the Common Members (including Plaintiffs), to their resulting injury.

278. If Howard Brown had not reopened negotiations with Staples in November 2016, the Staples acquisition of BIC's operating subsidiaries would have gone forward on the terms described in the First LOI. If that transaction had consummated, the Common Members, including Plaintiffs, would have received the entirety of their original investments and an approximately 30% return on that investment. Further, they would have avoided all of the extraordinary tax consequences that resulted from the January 2018 Restructuring.

279. If Howard Brown had not prevented BIC from going forward with the November 2017 transaction, the Common Members, including Plaintiffs, would have received approximately 12 cents on the dollar returned from their original investment, instead of less than 1 cent on the dollar that they ultimate received. In addition, the Common Members would not have been attributed millions of dollars in ordinary income and capital gains.

280. Howard Brown's breaches of the implied covenant of good faith and fair dealing caused irrevocable and direct damage to the individual Common Members because BIC is a pass-through entity. Thus, the consequences of Howard Brown's breaches flowed directly and disproportionately the Plaintiffs, as opposed to the Preferred Unit Holders and/or BIC itself. Further, because the capital structure of BIC changed as a result of the Restructuring, any remedy obtained by BIC as a result of a derivative action would flow to wrongdoers, and not to the Common Members, including the Plaintiffs.

281. In addition, and in the alternative, to the extent that this cause of action is one belonging to BIC, demand on the Board of Managers should be excused as futile. Upon information and belief, the Board of Managers consists of Howard Brown, Michael Brown, John Frisk, and Steven Goldman, each of whom is alleged to have personally engaged in wrongful and bad faith conduct by this Complaint. There is no reasonable basis to believe the BIC Board would agree to take action against its own Managers, i.e. against themselves personally. Accordingly, the BIC Board of Managers would not have been able to evaluate a demand independently and without self-interest, and demand would have been futile.

<u>Seventh Cause of Action (Against the 2015-2017 Managers)</u>

<u>Breach of Duty of Good Faith and Fair Dealing</u>

282. Paragraphs 1 through 281 above are repeated and realleged and incorporated herein.

283. The Third A&R constitutes a contract between and among its managers, members, and officers. The Third A&R granted the 2015-2017 Managers broad discretion to control significant aspects of their relationship with the Common Members, including the authority the approve a sale of BIC or substantially all of its assets (Section 6.3) and amend the BIC operating agreement (Section 10.1). The 2015-2017 Managers had the obligation to exercise their discretion under these provisions consistently with the implied covenant of good faith and fair dealing.

284. As detailed above, and as further outlined below, the 2015-2017 Managers breached the implied covenant by engaging in the following violative acts:

a. Authorizing and allowing Howard Brown to engage in self-dealing by re-trading the 2016 deal terms with Staples, which ultimately resulted in the termination of the 2016 acquisition;
b. Authorizing and allowing Howard Brown to act as BIC's agent in the 2017 negotiations, despite his demonstrated self-dealing;
c. Sabotaging the potential sale to Staples in 2017 by preventing the deal from going forward in the absence of a $7 million re-trade in favor of BIC; and
d. Authorizing the First Amendment to the Third A&R, which deceptively curtailed the Common Members' ability to effectively exercise their preemptive rights and paved the way for certain transactions in the Restructuring to occur without the Common Members' knowledge or approval.

285. As described in Paragraphs 73 to 83, above, in 2016 Howard Brown sought to "re-trade" the agreement in principal BIC had reached with Staples in order to obtain multi-million cash payments for himself and his son, Michael Brown.

286. Upon information and belief, each of the 2015-2017 Managers knew that Howard Brown was engaged in direct negotiations with Staples in November 2016 to obtain benefits personal to him and his son, Michael Brown. Michael Brown, Steven Goldman, Michael Cornell, Les Goodman, Andrew Kohn, Jay Nadel and Michael Novoseller were each present at the October 31, 2016 Meeting of the BIC Board of Managers wherein Howard Brown advised those managers that he was going to raise with Staples a new deal term which would provide each of Howard Brown and Michael Brown $3 million in personal non-compete payments. Those managers passed a resolution authorizing the allocation of $6 million in closing proceeds from the Staples acquisition to Howard Brown and Michael Brown, which they knew was a significant deviation from the terms outlined in Staples' August 30, 2016 Letter of Proposed Acquisition.

287. Although not physically or telephonically present at the October 31, 2016 meeting, upon information and belief, Randi Sidgmore and Andrew Kovach knew of and approved the $6 million re-trade and authorized Howard Brown to undertake negotiations to that effect. It was Howard Brown's custom and practice to call Managers who could not attend board meetings (either immediately before or immediately after the meeting) to outline the topics for discussion and elicit their approval on matters requiring consent.

288. Upon information and belief, none of the 2015-2017 Managers took any steps to discourage or prevent these direct negotiations for the personal benefit of Howard Brown and Michael Brown. As a result of this attempt by Howard Brown to "re-trade," Staples withdrew from the 2016 agreement in principle.

289. If Howard Brown had not reopened negotiations with Staples in November 2016, the Staples acquisition of BIC's operating subsidiaries would have gone forward on the terms described in the First LOI. If that deal had been consummated, the Common Members, including

Plaintiffs, would have received the entirety of their original investments and an approximately 30% return on that investment. Further, they would have avoided all of the extraordinary tax consequences that resulted from the January 2018 Restructuring.

290. Despite Howard Brown's demonstrated re-trade of and self-dealing in the 2016 negotiations, each of the 2015-2017 Managers authorized Howard Brown to act as agent for BIC in renewed negotiations with Staples in 2017. Upon information and belief, each of the 2015-2017 Managers knew that Howard Brown intended—again—to insist upon large non-compete payouts to himself and Michael Brown. Indeed, at the expense of the overall purchase price (which Staples slashed by $33.5 million), the 2015-2017 Managers authorized BIC to enter into the April 14, 2017 LOI, which contained non-compete payments in the amount of $2 million to each of Michael and Howard Brown and which reflected the greatly reduced purchase price.

291. On June 27, 2017, John Frisk sent an email to numerous HiTouch officers and employees acknowledging that, yet again, Staples felt that Howard Brown was "re-trading the transaction" to the tune of $7 million. In another June 27, 2017 e-mail, John Frisk also acknowledged that the 2015-2017 Managers were not going to approve the Staples acquisition over the disputed $7 million.

292. The 2015-2017 Managers insisted on the $7 million re-trade and unreasonably sabotaged the 2017 sale despite the fact that BIC could not pay its lenders or its operational costs.

293. If Howard Brown and the 2015-2017 Managers had not prevented BIC from going forward with the November 2017 transaction, the Common Members, including Plaintiffs, would have received approximately 12 cents on the dollar returned from their original investment, instead of less than 1 cent on the dollar that they ultimate received. In addition, in that scenario, the

Common Members would not have been attributed millions of dollars in ordinary income and capital gains.

294. Moreover, the 2015-2017 Managers breached the implied covenant by engaging in the deceitful, oppressive, and underhanded tactic of amending the Third A&R to: (1) deprive the Common Members of essential components of their bargained-for preemptive rights; and (2) to allow for the authorization of key transactions in the Restructuring **without** the approval, consent, or knowledge of the Common Members.

295. Specifically, the 2015-2017 Managers amended section 2.13(a) of the Third A&R to include "the entry into or performance of obligations under the Term Loan Agreement" with ArrowMark (and any documents related thereto) as an "Exempt Affiliated Transaction"—a transaction that allowed the BIC Board of Managers to act **without** the approval of any BIC members. Explicitly included as part of this new "Exempt Affiliated Transaction" was the authority to modify or recapitalize any of the obligations under the Term Loan Agreement (and/or any affiliated documents/agreements), **including any conversion of the obligations thereunder into equity**.

296. Further, the 2015-2017 Managers deceitfully and oppressively amended the Third A&R to eliminate the Board of Manager's obligation to offer the Common Members the ability to exercise their preemptive rights **at least 10 days before** a new issuance of equity securities under Section 4.3.

297. Taken together, these amendments allowed the BIC Board of Managers to proceed with the complex transactions that comprised the Restructuring and issue new equity in BIC without providing the Common Members adequate notice to digest the ramifications of the Restructuring and make an informed decision about whether to exercise their preemptive rights.

298. In authorizing these amendments, the 2015-2017 Managers deprived the Common Members of their reasonable expectations under the BIC Operating Agreement, including their expectation that they would be adequately protected against dilution and the arbitrary deprivation of their investments in BIC.

299. Accordingly, each of the Common Members, including Plaintiffs, was injured by the breaches of the implied covenant of good faith and fair dealing by the 2015-2017 Managers. These breaches of the implied covenant of good faith and fair dealing caused irrevocable and direct damage to the individual Common Members because the purpose of the Restructuring was to disadvantage the Common Members, the class in which the Plaintiffs fall, and not BIC as a whole. As described above, the consequences of these breaches flowed directly to the Plaintiffs, as opposed to the Preferred Unit Holders and/or BIC itself. Further, because the capital structure of BIC changed as a result of the Restructuring, any remedy obtained by BIC as a result of a derivative action would flow to wrongdoers, and not to the Common Members, including the Plaintiffs.

300. In addition, and in the alternative, to the extent that this cause of action is one belonging to BIC, demand on the Board of Managers should be excused as futile. Upon information and belief, the Board of Managers consists of Howard Brown, Michael Brown, John Frisk, and Steven Goldman, each of whom is alleged to have personally engaged in wrongful and bad faith conduct by this Complaint. There is no reasonable basis to believe the BIC Board would agree to take action against its own Managers, i.e. against themselves personally. Accordingly, the BIC Board of Managers would not have been able to evaluate a demand independently and without self-interest, and demand would have been futile.

## Eighth Cause of Action (Against ArrowMark and HiTouch Nashville)

## Breach of Implied Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty

301. Paragraphs 1 through 300 above are repeated and realleged and incorporated herein.

302. ArrowMark and HiTouch Nashville were collectively identified as BIC's Tax Representative under the Fourth BIC A&R and the Fifth BIC A&R, and collectively served as the Tax Representative from at least the January 2018 Restructuring to, upon information and belief, the date of this Complaint.

303. The Fourth BIC A&R and the Fifth BIC A&R constitute contracts between and among its managers, members, officers, and Tax Representatives. Section 13.2 of the Fourth BIC A&R and the Fifth BIC A&R granted the Tax Representatives (referred to in those agreements as "tax matters partner or partnership representative"), ArrowMark and HiTouch Nashville, broad discretion to control the tax reporting obligations of BIC, and as such was "entitled to prepare, file and amend any tax returns of [BIC]." (Ex. 5 at 3404) (Ex. 1 at 323-324). As such, ArrowMark and HiTouch Nashville had the obligation to exercise their discretion under these provisions consistently with the implied covenant of good faith and fair dealing.

304. As Tax Representatives, ArrowMark and HiTouch Nashville also owed non-waivable fiduciary duties under federal law to all of the investors in BIC, and because of tax rules regarding disregarded entities, all of the investors in its subsidiaries.

305. Both sets of duties were owed to the Common Members, including Plaintiffs.

306. In violation of those duties, ArrowMark and HiTouch Nashville engaged in the above-described scheme to defraud, whereby it, along with others, schemed to generate paper losses for itself and its affiliates through sham cancellation of debt transactions. The consequence of these transactions was that the Common Members, including Plaintiffs, incurred millions of dollars in tax liabilities as a result of cancellation of debt income being attributed to them. As Tax Representative, ArrowMark and HiTouch Nashville had sole control over the information on the

K-1s issued to the Common Members and used that control to the benefit of themselves and their affiliates and to the detriment of the Common Members, including Plaintiffs.

307. In further violation of these duties, ArrowMark and HiTouch Nashville, with the help of others, reorganized the tax treatment of the MyOP Inc. transfer of control shares for MyOP LLC in 2012 in order to generate millions-of-dollars in capital gains income for the Common Members, including Plaintiffs, for the 2018 tax year. As Tax Representative, ArrowMark and HiTouch Nashville had sole control over the information on the K-1s issued to the Common Members. By reorganizing the tax treatment for MyOP LLC for 2012, ArrowMark and HiTouch Nashville used that authority for the benefit of themselves and to the detriment of the Common Members, through the distribution of millions-of-dollars in capital gains income from ArrowMark and HiTouch Nashville and their affiliates, on the one hand, to the Common Members, including Plaintiffs, on the other.

308. To establish liability for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a contract, a duty, and a breach thereof resulting in injury to plaintiff. As described above, the Plaintiffs had a contractual relationship with HiTouch Nashville and ArrowMark in the Fourth BIC A&R and the Fifth BIC A&R. HiTouch Nashville and ArrowMark were required to carry their obligations under those contracts consistently with the implied covenant of good faith and fair dealing. By engaging in the acts alleged above, they unreasonably and arbitrarily deprived Plaintiffs of the benefits of their investments, leading to Plaintiffs suffering injury in the form of millions of dollars of tax liability.

309. To establish liability for breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed a fiduciary duty and that the defendant breached that duty. As indicated above, ArrowMark and HiTouch Nashville, as Tax Representatives, owed Common Members a

non-waivable fiduciary duty, requiring they act in the best interests of the Common Members. By acting in a manner beneficial to their own interests and detrimental to the interests of the Common Members, they breached this duty when they took the actions described above.

Ninth Cause of Action (Against BIC Insiders and 2018 Managers)

Gross Negligence

310. Paragraphs 1 through 309 above are repeated and realleged and incorporated herein.

311. In the alternative, each of the BIC Insiders and the 2018 Managers had an obligation to exercise the care that a reasonably prudent person would have exercised in handling investments made by others.

312. By engaging in the acts above, which caused in the loss of virtually the entire investments of the Common Members, including Plaintiffs, and caused the Common Members, including Plaintiffs, to incur of millions of dollars in federal and state tax liability, the BIC Insiders and 2018 Managers grossly violated that standard of care. Because these acts were taken for the benefit of the 2018 Managers and their associated entities (including Hownan Investment Co., ArrowMark, and HiTouch) with at least reckless disregard for the consequences of these acts on the Common Members, the 2018 Managers acted in bad faith. In turn, this caused injury to the Common Members, including the Plaintiffs, to wit, the loss of their entire investments and the incurring of tax liability for millions-of-dollars in capital gains and ordinary income attributed to them.

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a. Compensatory damages in an amount to be determined at trial, including, without limitation, those damages arising from federal and state tax liability caused by the distribution of ordinary income and capital gains to Plaintiffs;

b. Pre-judgment and post-judgment interest;

c. Punitive damages against Defendants in an amount to be determined at trial;

d. An order awarding disbursements, costs, and attorneys' fees; and

e. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
April 24, 2020

/s/ Andrew St. Laurent
Andrew St. Laurent
Michelle Fox
Harris St. Laurent LLP
40 Wall Street, 53rd Floor
New York, NY 10005
Tel: (646) 248-6010
andrew@hs-law.com

*Attorneys for Plaintiffs*