USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/31/2021_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH AIELLO, MATTHEW DRAPKIN, ESTATE OF DONALD DRAPKIN, MICHAEL J. PALMER, MICHAEL J. PALMER AND VIRGINIA A. PALMER LIVING TRUST, ADAM BERK, ROBERT SCHECTERSON, AMY GRABINO, ANTHONY CAVALIERI, MELVIN GOLDBERG, LAWRENCE KAYE, ANN KAYE, LAWRENCE G. KAYE AND H. ANNE KAYE 1996 REVOCABLE LIVING TRUST, TERRY WEBER, JOHN HELM, BRIAN KAFFEE, STUART KAFFEE, KAFFEE CO. LLC, JASON PALMER, PAUL SWISTAK, JAMES TISONY, and DAVID SNIDER,

                Plaintiffs,

-against-

HOWARD BROWN, MICHAEL BROWN, HITOUCH NASHVILLE, LLC, ARROWMARK COLORADO HOLDINGS, LLC, DAVID CORKINS, STEVEN M. GOLDMAN, JOHN EISINGER, MICHAEL NOVOSELLER, SANJAI BHONSLE, KAREN REIDY, DANA STAGGS, JOHN FRISK, ANDREW KOHN, MICHAEL CORNELL, LES GOODMAN, ANDREW KOVACH, JAY NADEL, and RANDI SIDGMORE,

                Defendants.

BROWN (RI) INVESTMENT COMPANY, LLC,

                A Required Party.

19 Civ. 9647 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, holders of common units of Brown (RI) Investment Company, LLC ("BIC"), bring this action against Defendants, HiTouch Nashville, LLC ("HiTouch"), ArrowMark Colorado Holdings, LLC ("ArrowMark"), a "control person" of both entities, and certain of BIC's current and former managers and affiliates, alleging violations of the federal securities laws and state law.

FAC, ECF No. 70.  Defendants Howard Brown, Michael Brown (together, the "Browns"), Steven M. Goldman, John Frisk, Andrew Kohn, Michael Cornell, Les Goodman, Jay Nadel, and Randi Sidgmore (collectively, the "BIC Defendants") move to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 75.  Separately, Defendants ArrowMark, HiTouch, Sanjai Bhonsle, David Corkins, John Eisinger, Michael Novoseller, Karen Reidy, and Dana Staggs (collectively, the "ArrowMark Defendants," and with the BIC Defendants, "Defendants") move to dismiss the claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 78.  For the reasons stated below, Defendants' motions to dismiss Plaintiffs' federal claims are GRANTED.  Defendants' motions to dismiss Plaintiffs' state law claims are GRANTED without prejudice.

## BACKGROUND

The following facts are taken from the complaint and accepted as true for the purposes of this motion.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007).

BIC functioned as a holding company for a portfolio of businesses within the office services and supply industry.  FAC ¶ 1.  In 2014, BIC began to experience cash flow problems.  *Id*. ¶ 60.  To alleviate these concerns, BIC entered into two credit facilities: one with JP Morgan and another with ArrowMark.  *Id*.  The credit facility with ArrowMark totaled up to $27.5 million, plus up to an additional $10 million.  *Id*. ¶ 62.  In return, the BIC Board of Managers (the "BIC Board") issued to ArrowMark and certain of its co-investors preferred units—a new class of ownership interest in BIC on favorable terms—and common units representing approximately 4% of the issued outstanding common units for no additional consideration.  *Id*. ¶ 63.  ArrowMark purchased approximately $7.5 million in preferred units.  *Id*.  BIC's amended and restated operating agreement (the "BIC A&R") also provided ArrowMark with a seat on the BIC Board,

that was filled by Defendant Michael Novoseller, and provided that the BIC Board could not take certain actions without the approval of the ArrowMark board member. *Id*. ¶ 64; ECF No. 70-2.

In 2016, BIC and Staples entered into negotiations concerning Staples' interest in purchasing BIC subsidiaries HiTouch and MyOp LLC. FAC ¶ 69. Soon thereafter, the parties executed the first letter of intent, which provided that Staples would acquire HiTouch and MyOp LLC for $110 million in cash. *Id*. ¶¶ 69–70. Before the deal closed, BIC defaulted for a second time on its loan with JP Morgan, and JP Morgan issued a second forbearance agreement and conditioned the agreement on BIC's closing the transaction with Staples. *Id*. ¶ 72.

Plaintiffs allege that the acquisition fell apart because Howard Brown attempted to renegotiate certain terms that would provide payments to himself and his son, Michael Brown, as part of the consideration. *Id*. ¶¶ 73–83. Plaintiffs claim that the elected managers of BIC and MyOp Holdings (the "2015–2017 Managers"), including the Browns, Goldman, Kohn, Cornell, Goodman, Kovach, Nadel, Sidgmore, and Novoseller, *id*. ¶ 49, authorized Howard Brown to negotiate these payments, *id*. ¶¶ 77–78. In 2016, Staples reduced its proposed purchase price to $70 million, and ultimately walked away from the transaction. *Id*. ¶¶ 81, 83.

In light of the failed deal, by letter dated December 5, 2016 (the "December 5 Letter"), Howard Brown informed investors that Staples, BIC, and MyOp LLC had mutually decided to terminate negotiations. *Id*. ¶¶ 85, 87. Plaintiffs allege that the December 5 Letter contained material omissions. Brown also used the December 5 Letter to gauge investor interest in a $5 to $10 million preferred equity offering which he indicated would be less punitive to common members than the injection of outside capital. *Id*. ¶ 89.

By letter dated January 9, 2017 (the "January 9 Letter"), Brown advised investors that instead of a preferred equity offering, there would be a convertible note offering. *Id*. ¶ 90. Plaintiffs allege that the January 9 Letter also contained material omissions and misstatements,

including that it framed the convertible note offering as a method to "bridge the timing gap" until BIC found a long-term solution to its liquidity issues, even though HiTouch, ArrowMark, the Browns, Goldman, and Frisk (defined by Plaintiffs as "BIC Insiders"), should have known that the only solution would have been an acquisition. *Id*. ¶¶ 47, 91–93.

In March 2017, BIC and Staples entered into another round of negotiations. *Id*. ¶ 94. BIC and ArrowMark modified their loan agreement for the fourth time. *Id*. ¶ 95. The amended agreement provided that ArrowMark would increase its term loan to $30.9 million. *Id*. BIC then took out another loan from ArrowMark, and separately, JP Morgan agreed to extend forbearance once again. *Id*. In April 2017, BIC and Staples executed a second letter of intent, which contemplated that Staples would purchase BIC's subsidiaries for $76.5 million, subject to certain holdbacks to secure BIC's post-closing obligations. *Id*. ¶ 97. In November 2017, the negotiations between Staples and BIC stalled.

Plaintiffs allege that between December 2017 and June 2018, the BIC Insiders devised a plan to carry out a series of transactions, referred to as "the restructuring," which generated substantial tax advantages for ArrowMark, provided direct payments for certain BIC Insiders, and created profitable short-term investments for certain BIC Insiders. *Id*. ¶¶ 103–12.

First, Plaintiffs allege that the BIC Insiders and the 2015–2017 Managers amended the BIC A&R to prevent the common members from protecting themselves from self-dealing, and altered the notification period with respect to common members' preemptive rights. *Id*. ¶¶ 113–14. Next, a series of transactions resulted in ArrowMark's cancellation of $14 million in debt. *Id*. ¶ 125. The BIC A&R was further amended to provide that "no portion of cancellation of indebtedness income . . . arising from the restructuring . . . shall be allocated to ArrowMark or its affiliates," which created a substantial tax benefit for ArrowMark at the expense of the common members. *Id*.

¶¶ 126–27.  And, BIC issued another round of preferred shares to ArrowMark and other BIC Insiders.  *Id*. ¶¶ 132–37.

Plaintiffs allege that an integral piece of the "restructuring scheme" required that they decline to participate in the preferred equity offering made for the benefit of ArrowMark and the BIC Insiders.  On April 23, 2018, BIC circulated two documents to its common members, a preemptive offer letter (the "Preemptive Offer Letter") and a private placement memorandum (the "Private Placement Memorandum"), informing common members of an April 2018 preferred equity offering.  *Id*. ¶¶ 138–39.  Plaintiffs allege that these communications from Howard Brown contained material omissions and misstatements regarding the likelihood of the impending Staples transaction.[1]  *Id*.  In the Preemptive Offer Letter, Howard Brown requested that investors forgo their preemptive rights with respect to the first $5 million of Class A preferred units it had sold to ArrowMark, stating that the BIC Board determined that it was "appropriate for ArrowMark to invest a minimum of $5 million" in connection with the April 2018 preferred equity offering.  *Id*. ¶ 147; ECF No. 70-3.  Plaintiffs allege that, to their detriment, they forfeited their preemptive rights based on these communications.  *Id*. ¶ 148.

On May 31, 2018, BIC and Staples entered into a third letter of intent, *id*. ¶ 149, which contemplated a purchase price of $78.5 million.  *Id*.  The acquisition closed on June 26, 2018, and Staples received 100% of BIC's interest in its subsidiaries, HiTouch and MyOp LLC.  *Id*. ¶ 150. The transaction included bonuses, cash payments, retention bonuses, and signing bonuses for the BIC Insiders.  *Id*. ¶¶ 151–52.

---

[1] For example, the Private Placement Memorandum stated the following: "From time to time, [BIC] receives inquiries from third parties regarding potential transactions, including, for example, acquisitions of or business combinations with [BIC] and/or its subsidiaries.  [BIC] considers such inquiries as they are proposed in order to determine whether any such potential transaction would be in the best interests of [BIC] and its members.  Such consideration may sometimes include meetings and/or other discussions with management of third parties.  There can be no assurance that any such inquiries or discussions will result in any potential transactions actually occurring."  FAC ¶ 139.

Preferred unit holders also had the right to receive substantial additional proceeds as a result of the special priority granted to them under the BIC A&R. *Id.* ¶¶ 153–58. In addition to the priority contained in the BIC A&R, the MyOp LLC operating agreement also contained priority provisions for preferred unit holders, which permitted the BIC Insiders to pay out at least a 100% return on investments to preferred unit holders for a second time. *Id.* ¶¶ 159–60. Plaintiffs allege that this preferential treatment was afforded to the preferred unit holders largely, if not entirely, for the purpose of compensating ArrowMark, the largest holder of preferred units, for the debt it had previously cancelled. *Id.* ¶ 161. Plaintiffs contend that this parallel priority provision served no purpose other than to fraudulently disguise the double premium granted to preferred unit holders at the expense of common members. *Id.* ¶ 164.

By contrast, Plaintiffs allege that common members received payments for their interest amounting to less than 1% of their initial investment, the majority of which was held back pursuant to the transaction agreement to ensure that BIC and its affiliates carried out their non-compete and other obligations. *Id.* ¶ 168. In addition, common members were allocated substantial amounts of ordinary income and capital gains as a result of the acquisition, which vastly exceeded the amounts of their respective cash-dollar proceeds from the sale. *Id.* ¶ 169. Plaintiffs allege that, as a whole, common members were made liable for millions of dollars in both taxable ordinary income and taxable capital gains. *Id.* ¶ 171.

## DISCUSSION

I. Legal Standards

    A. 12(b)(6) Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to

provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *ATSI Commc'ns, Inc.*, 493 F.3d at 98.

In determining the sufficiency of the complaint, "the tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Pensions Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (internal quotation marks and citation omitted). For the purposes of a motion to dismiss, "a complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (internal quotation marks and citation omitted).

II. <u>Analysis</u>

A. Failure to State a Claim under Section 10(b) and Rule 10b-5

Plaintiffs allege in their first three causes of action that certain Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. FAC ¶¶ 172–245. Defendants move to dismiss these federal claims on the ground that Plaintiffs do not have standing to sue under Section 10(b) and Rule 10b-5.

The Court holds that Plaintiffs have not demonstrated their right to sue, also known as statutory standing, under Section 10(b) and Rule 10b-5. The Supreme Court has made clear that "what has been called 'statutory standing' in fact is not a standing issue, but simply a question of

7

whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). The Court uses the phrase "statutory standing," consistent with the parties' arguments on standing, to refer to Plaintiffs' right to pursue a cause of action under Section 10(b) and Rule 10b-5.

Section 10(b) of the Securities Exchange Act does not, on its face, provide a right of action for civil remedies. 15 U.S.C. § 78j. Similarly, as the Supreme Court has noted, there is no indication that the Securities and Exchange Commission (the "SEC"), in promulgating Rule 10b-5, considered the question of private civil remedies under the Rule. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975). Nevertheless, courts have interpreted these provisions to contain an implied private right of action, and the Supreme Court has endorsed this view. In *Blue Chip Stamps*, the Supreme Court adopted the *Birnbaum* rule, limiting plaintiffs under these provisions to "actual purchasers or sellers of securities." *Id*. at 731, 754–55. In so finding, the Supreme Court acknowledged that "holders of . . . contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities." *Id*. at 751. Indeed, under the Securities Exchange Act, the terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire a security. 15 U.S.C. § 78c(13). And, the terms "sale" and "sell" each include any contract to sell or otherwise dispose of a security. *Id*. § 78c(14). Thus, a plaintiff with a contractual right to purchase or sell a security can bring suit for fraud under Section 10(b) and Rule 10b-5.

Defendants argue that Plaintiffs have failed to state a claim because Plaintiffs cannot show that they are actual purchasers or sellers of securities. ArrowMark Mem. 9–10, ECF No. 79; BIC Mem. at 9; ECF No. 76. Plaintiffs concede that they did not exercise their preemptive rights to purchase securities from any issuance of securities following their initial investment. Pl. Opp'n at 24, ECF No. 83; FAC ¶¶ 226–27. Instead, Plaintiffs contend that they had a contractual right to purchase

8

or sell securities in April 2018, as embodied in the BIC A&R, but declined to do so based on the material omissions of the BIC Insiders. Pl. Opp'n at 24–27.

Therefore, the threshold question for the Court is whether the BIC A&R created a contractual right to purchase or sell securities such that Plaintiffs are actual purchasers or sellers under the securities laws. The Court looks to the language of the Fourth BIC A&R, which governed the April 2018 preemptive offer. *See* ECF No. 70-4. The BIC A&R provides, in relevant part, as follows:

> If the Board of Managers decides to cause the Company to issue additional Units or other equity securities of any kind or nature . . . (the "Proposed Issuance"), each Common Member shall first be offered the opportunity to subscribe for such issues of Equity Securities, pro rata in proportion to the number of outstanding Common Units held by such Common Member, on the same terms and conditions as the Board of Managers proposes to issue such Equity Securities ("Preemptive Rights") . . . . For purposes of [this section], "Equity Securities" means additional Units and/or Other Equity Securities.
>
> [ . . .]
>
> The Company shall deliver a written notice . . . to each Common Member, at least 10 days in advance of the Proposed Issuance. . . . Such Common Member may exercise its right to purchase, pro rata, such Equity issuance by *irrevocably agreeing* to purchase, pro rata in proportion to the number of outstanding Common Units held by such Common Member, such Equity Securities pursuant to a notice (the "Irrevocable Purchase Notice") . . . that it delivers to the Company within five (5) days after its receipt of the Proposed Issuance Notice.

BIC A&R §§ 4.3(a), (b), ECF No. 70-5 (emphasis added).

District courts are split on whether preemptive rights establish a contractual right to purchase or sell a security. *See, e.g.*, *Brennan v. EMDE Med. Research, Inc.*, 652 F. Supp. 255, 258–59 (D. Nev. 1986) (purchase); *Doll v. James Martin Assocs. (Holdings) Ltd.*, 600 F. Supp. 510, 522 (E.D. Mich. 1984) (not a purchase). The parties have not cited any circuit court case law on the issue. In the absence of direct binding authority, the Court turns to guidance from the Second Circuit. The Second Circuit takes the view that a securities transaction takes place when the parties "incur irrevocable liability." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d

Cir. 2012). Thus, a transaction occurs when the parties are committed to one another. "Commitment is a simple and direct way of designating the point at which, in the classic contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform." *Id*. (internal quotation marks and citation omitted).

The Court finds that the BIC A&R does not confer upon Plaintiffs a contractual right to purchase or sell a security because the parties did not "incur irrevocable liability" when Plaintiffs received the preemptive offer. BIC A&R § 4.3(b). Plaintiffs concede that the BIC Insiders transmitted a preemptive offer to Plaintiffs on April 23, 2018, and that Plaintiffs did not exercise their preemptive rights in accordance with the mechanisms outlined in the BIC A&R. Pl. Opp'n at 24–25. Plaintiffs, therefore, cannot establish that "there was a contractual relationship to buy or sell securities between the parties." *Ronzani v. Sanofi S.A*., 899 F.2d 195, 197–98 (2d Cir. 1990) (finding that plaintiff failed to allege a contractual relationship where plaintiff's right to acquire securities was triggered by a third-party's acceptance of an offer). Plaintiffs argue that they were tricked into not exercising their preemptive rights. But, numerous courts have found that the "mere allegation[] that a plaintiff was induced to retain securities because of a defendant's misrepresentation [is] not sufficient to state a claim under Rule 10b-5." *Goldman v. A.G. Becker, Inc.*, 1983 WL 1302, at *3 (S.D.N.Y. Apr. 20, 1983); *see also Weiner v. Rooney, Pace Inc*., 1987 WL 11281, at *2 (S.D.N.Y. Feb. 20, 1987).

The Court finds guidance in the Supreme Court's dicta in *Blue Chip Stamps*. There, the Supreme Court recognized that the "holders of puts, calls, [and] options" have a contractual right or duty to purchase or sell a security, and thus, are deemed purchasers or sellers. 421 U.S. at 750–51. But Plaintiffs' preemptive rights under the BIC A&R are not puts, calls, options, or debentures, as defined under the Securities Exchange Act, *see* 15 U.S.C. § 78(c)(10). Thus, Plaintiffs' reliance on

*Green v. Hamilton International Corp.*, which concerned convertible debentures, is misplaced. 437 F. Supp. 723, 726–27 (S.D.N.Y. 1977).

Moreover, the Court finds that "[Plaintiffs are] in effect seeking a judicial reinsertion of language into the Act." *Blue Chip Stamps*, 421 U.S. at 750–51 n.13. As the Supreme Court has noted, previous iterations of the Act included "offer[s] to acquire or solicitation of an offer to sell a security" and "offer[s] to dispose of, or solicitation of an offer to buy a security," but the ambit of these provisions was narrowed before its final passage. *Id.* And, a conclusion to the contrary would implicate the very concerns that the Supreme Court articulated in *Blue Chip Stamps*. Although Plaintiffs posit that their injury is easily quantifiable, *see* Pl. Opp'n at 25, the Court disagrees. Because Plaintiffs are suing on an "intangible economic injury such as loss of a noncontractual opportunity to buy or sell," they are "more likely [to be] seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis." *Blue Chip Stamps*, 421 U.S. at 734–35.

Accordingly, Defendants' motions to dismiss Plaintiffs' claims under Section 10(b) and Rule 10b-5 are GRANTED.

B. Control Person Liability Under Securities Exchange Act Section 20(a)

Plaintiffs also allege control person liability under § 20(a) of the Securities Exchange Act against David Corkins, the managing member of both ArrowMark and HiTouch, who allegedly participated in the "restructuring scheme." Pl. Opp'n at 42–43; FAC ¶¶ 34, 237–44. To state a claim under § 20(a), a party must allege facts showing: "(1) an underlying primary violation of the securities laws by the controlled person; (2) control over the controlled person; and (3) that the controlling person was, in some meaningful sense, a culpable participant in the controlled person's primary violations." *Menaldi v. OCH-ZIFF Cap. Mgmt. Grp.*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) (internal quotation marks and citation omitted). This claim is necessarily predicated on a

primary violation of securities law. *Rombach v. Chang*, 355 F.3d 164, 178–79 (2d Cir. 2004). Because Plaintiffs have failed to state a primary securities claim against Defendants, this secondary claim must also be dismissed. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

Accordingly, the ArrowMark Defendants' motion to dismiss this cause of action is GRANTED.

### C. State Law Claims

The remainder of Plaintiffs' claims arise under state common law. FAC ¶¶ 246–312. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims when the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Here, the Court has dismissed all federal law causes of action. When such claims "are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). The Court finds no reason to deviate from this general principle here.

The Court notes that Plaintiffs assert subject matter jurisdiction under 28 U.S.C. § 1332. FAC ¶ 6. But, on its face, the complaint fails to properly plead diversity jurisdiction, as it does not allege the citizenship of the parties. FAC ¶¶ 9–46; *Strother v. Harte*, 171 F. Supp. 2d 203, 205 (S.D.N.Y. 2001) ("For purposes of diversity jurisdiction, a limited liability company has the citizenship of each of its members."). Nor have Plaintiffs explained their basis for their claim of diversity jurisdiction before the initial pretrial conference, as required by Rule II.B of the Court's Individual Practices in Civil Cases. Therefore, even if Plaintiffs were asserting diversity jurisdiction, the Court does not have subject matter jurisdiction to entertain Plaintiffs' state law claims as pleaded in the amended complaint.

Accordingly, Defendants' motions to dismiss the state law claims are GRANTED without prejudice and with leave to replead.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss Plaintiffs' federal claims are GRANTED, and Defendants' motions to dismiss the state law claims are GRANTED without prejudice.  Plaintiffs may file a second amended complaint alleging the citizenship of each constituent person or entity by **April 15, 2021**.  If Plaintiffs fail to amend the complaint by the foregoing date to truthfully allege complete diversity based upon the citizenship of each constituent person or entity, then the case shall be closed.

The Clerk of Court is directed to terminate the motions at ECF Nos. 75 and 78.

SO ORDERED.

Dated: March 31, 2021
       New York, New York

_____
ANALISA TORRES
United States District Judge